UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 1:20-cv-24328-MGC

ANA MARGARITA MARTINEZ,

      Plaintiff,

v.

NETFLIX, INC.,
ORANGE STUDIOS, S.A., and
OLIVIER ASSAYAS

      Defendants.

_____/


**<u>DEFENDANT NETFLIX, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>**

Defendant Netflix, Inc. ("Netflix") respectfully submits this memorandum of law in support of its motion to dismiss the Complaint of plaintiff Ana Margarita Martinez ("Martinez" or "Plaintiff") pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

## PRELIMINARY STATEMENT

This is a defamation action concerning the film "Wasp Network" (the "Film"), a docudrama about a Cuban spy ring that infiltrated Florida's Cuban exile community in the 1990s. The Film's plot tells how these spies posed as defectors so that they could learn, and report to the Cuban government, about anti-Castro organizations in Florida.  Plaintiff is a well-known member of the Cuban exile community who was romanced by and then married to one of those spies, having no knowledge about his activities until after he returned to Cuba and abandoned her.

Plaintiff complains that the Film "romanticizes" the Cuban spies, that it "legitimiz[es] and justif[ies]" Cuba's espionage, and that it unfairly depicts the anti-Castro activities of certain Cuban exile organizations.  While Plaintiff may have personal objections to dramatizations that are not overwhelmingly anti-Castro, such objections are not the stuff of a cognizable defamation claim, nor does an allegedly negative depiction of an anti-Castro organization constitute a defamatory statement about *Plaintiff*.  With respect to the docudrama's portrayal of the character who represents Plaintiff, the Complaint's descriptions of allegedly defamatory portrayals of Plaintiff as being sexually immoral, involved in criminal activity, or being a bad mother are so blatantly at odds with the actual content of the Film that it seems as if Plaintiff saw a different movie (or failed to watch the entire Film).  The Film in fact portrays Plaintiff's character in a positive light and, ultimately, as a victim of calculated and heartless deception by the spy she married.  Given Plaintiff's sympathetic portrayal in the Film, there is nothing in the Film that can reasonably be deemed to subject Plaintiff to "hatred, distrust, ridicule, contempt or disgrace," *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1101 (Fla. 2008) (citation omitted), and thus nothing that can conceivably be considered defamatory.

---

[1] Netflix has concurrently filed an anti-SLAPP motion pursuant to Section 768.295 of the Florida Statutes.

The application of the First Amendment's protections to motion pictures and other works of entertainment has been well-established since the Supreme Court's decision in *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952), in which the Court recognized that "[t]he importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform." *Id.* at 501; *see also Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65 (1981) ("Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee") (citations omitted).  That the Film alternately gives voice to different perspectives – sometimes that of Cuban exiles that Castro has destroyed their homeland, and sometimes that of the Cuban spies and Castro's government that certain U.S.-based anti-Castro organizations promoted "terrorist" activities – is not actionable defamation, let alone defamation of Plaintiff.

The required review of the complete Film demonstrates why all of Plaintiff's claims fail as a matter of law.  There is no defamation of Plaintiff. As a result, Plaintiff's claim of "conspiracy to defame" falls with her meritless defamation claims.  And Netflix's distribution of a film which Plaintiff alleges reminds her of past wounds borne of her real-life experience does not remotely support a claim for intentional infliction of emotional distress.

## BACKGROUND FACTS[2]

The historic tension between the governments of the United States and Fidel Castro's Cuba is well known. Castro's nationalizing of oil refineries and other businesses, and his relationship with the Soviet Union, engendered a U.S. embargo on Cuban goods, the failed 1961 Bay of Pigs invasion, and the Cuban Missile Crisis.  (Comp. at ¶¶ 31-44.)   Cuban refugees, opposed to the Castro regime, fled to Florida.  (*See id.* at ¶¶ 49-51.) The Cuban exile community in Florida, especially in Miami, was home to a number of anti-Castro organizations, including Brothers to the Rescue ("Brothers"), a "pro-democracy, humanitarian organization" that, among other things,

[2] These facts are drawn from the Complaint ("Comp.") and exhibits thereto.

conducts aerial search missions to aid rafters seeking to escape Cuba for a better life in the United States.  (*Id.* at ¶¶ 47-52.)

In the early 1990s, the Cuban government planted a number of undercover agents, who claimed to be defectors, into the Cuban exile community.  Among them was Juan Pablo Roque ("Roque"), a former major in the Cuban Air Force.  Roque swam to Guantanamo, purportedly to defect, in February 1992 and arrived in Miami the next month.  (*Id.* at ¶¶ 56-58.)

Roque met Plaintiff, an exile who had fled Cuba as a child in 1966, at a church event in May 1992 and began dating her soon thereafter.  Roque proposed to her within the first six months, but Plaintiff, who had been married twice before, was "cautious," and so they dated for three years before marrying.  (*Id.* at ¶¶ 53, 58-59.)  "Roque established himself as a presumed anti-Communist member of the Cuban exile community in Miami" and "infiltrated … organizations that had humanitarian missions directed toward helping and promoting democracy in Cuba."  He joined Brothers and also affiliated with the Cuban American National Foundation ("CANF"), another anti-Castro organization.  (*Id.* at ¶¶ 60-62.)  On February 22, 1996, Roque told Plaintiff that he was leaving on a business trip.  Three days later, Plaintiff saw Roque on a CNN interview from Havana, and discovered that her missing husband had returned to Cuba. (*Id.* at ¶¶ 91-92.)

The day after Roque left Miami, the Cuban Air Force shot down two of three unarmed Brothers planes, killing four Brothers members.  (*Id.* at ¶¶ 63-77.)  The downing of the planes occurred "after a week-long wave of repression by the Cuban government against Concilio Cubano, a Cuban-based umbrella organization of human rights activists, dissidents, independent economists, and independent journalists, among others." (*Id.* at ¶¶ 78-79.)  The attack on the Brothers' planes was internationally condemned, including by President Bill Clinton.  (*Id.* at ¶¶ 80-83.)

Five of the Cuban spies still living in the United States (dubbed "The Cuban Five") "were arrested in September 1998 and ultimately convicted in Miami [in 2001] of conspiracy to commit espionage, conspiracy to commit murder [of the downed Brothers pilots], acting as unregistered agents of a foreign government, and other illegal activities."  (*Id.* at ¶¶ 85-90.)  "Roque was not

part of the trial," because he had returned to Cuba, but he was indicted in 1999 for failing to register as a foreign agent and conspiring to defraud the United States.  (*Id.* at ¶ 87.)

Plaintiff concluded that her marriage had been "a sham" and that she had been used as "an unwilling pawn by Roque to establish a creditable [sic] cover for his covert activities on behalf of the Cuban Government." (*Id.* at ¶¶ 93-94.)  Plaintiff sued the Cuban government in 1999, ultimately winning a substantial judgment in a Florida court in 2001.  (*Id.* at ¶¶ 99-101.)

### ***WASP NETWORK***[3]

The Film opens in the fall of 1990. Cuban pilot Rene Gonzalez ("Rene") starts an ordinary day, kissing his wife and daughter as he leaves for work.  But at the airport where he works, Rene absconds with a plane.  He flies to Miami and defects.  Rene is set up in an apartment by the CANF, which is led by Jorge Mas Canosa ("Canosa"), and given a job as a flight instructor.  Rene meets with Jose Basulto ("Basulto"), who recruits him to Brothers to monitor the ocean for exiles fleeing Cuba.  While Rene is on a flight with Basulto, Basulto flies them over Cuba and drops pro-democracy pamphlets over Havana neighborhoods, in defiance of Cuban air space restrictions, and ignores Cuban MiGs that try to intimidate them.

The Film then shows Roque, a former Cuban fighter pilot, swimming to Guantanamo to defect.  He is soon in Miami, in his cousin's apartment.[4]  The cousin is an FBI informant, and suggests that Roque also inform for the FBI, telling Roque that the FBI pays "big money" for "updat[ing] them on the [Cuban exile] community's mood."  (DVD Ex. at 20:20-21:04.)  The cousin also introduces Roque to Ana Margarita Martinez ("Ana")[5] at church. (DVD Ex. at 21:24-

---

[3] Netflix respectfully submits that the Court should review the full Film at issue, which is the subject of Netflix's concurrent Motion Permitting the Conventional Filing of DVDs. For the Court's convenience, the full Film is being submitted on DVD (the "DVD Ex."). The Film is incorporated by reference into, and is integral to, Plaintiff's Complaint. In ruling on a motion to dismiss, the Court may consider: (1) any material attached to the complaint as an exhibit (2) materials incorporated by reference and (3) documents that, although not incorporated by reference, are integral to the complaint and (4) matters on which a court may take judicial notice. *See Day v. Taylor,* 400 F.3d 1272, 1276 (11th Cir. 2005); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322-23 (2007).
[4] This scene is consistent with Plaintiff's recitation of events. (*See* Comp. ¶¶ 56-58.)
[5] "Ana" is used to refer to the "Ana Martinez" character in the Film.

21:43.)  Roque and Ana soon go on a date, at the end of which she resists his advances beyond a goodnight kiss.  (DVD Ex. at 21:30-23:25.)  Basulto later recruits Roque to join an elite group within Brothers.  Roque and Rene become friends, and Roque later tells Rene that he is going to marry Ana.

Life in Havana is hard for Rene's wife Olga and daughter Irma, especially because he has been branded a traitor.  Rene pines for Olga, but she tells Rene's brother that although she still loves him, she will not join him in the U.S.  On one of his flights, Rene is ordered to fly to a landing strip where he unwittingly becomes part of a drug smuggling operation.  When Rene visits Roque and Ana, he confidentially tells Roque, in Russian, that the exile organization PUND[6] is smuggling drugs and that he wants no part of it.  (DVD Ex. at 32:45-33:45.)  With Roque's cousin's help, Rene meets with the FBI contact, who also recruits Rene, and tells him that Roque has been an informant for a year for $1500 a week.  (DVD Ex. at 34:15-34:35.)  Rene chuckles – he now understands how Roque affords his expensive lifestyle.  (DVD Ex. at 34:35-35:00.)  Rene reveals PUND's drug smuggling to the FBI and helps set up a sting, but soon quits working for the FBI because he doesn't like being a "rat."

Roque comes home to find Ana happily working on wedding plans.  Ana, who has no idea that Roque is working as a well-paid FBI informant, questions him about the source of the money for his expensive cellphone and Rolex watch.  (DVD Ex. at 38:00-40:50.)  He initially says it's from a book deal he has made, but she doesn't believe this and asks if he's involved in drugs.  He tells her that he is not involved in drugs, followed by "but you don't know everything about me and it's better for you that way." (DVD Ex. at 40:48-40:58.)

There is a big turnout of the exile community at Ana and Roque's wedding.  The church service is followed by a garden party, and then an after-party at a night club. In the early hours of the next morning, Roque carries Ana to the balcony of their hotel room, kissing her. (DVD Ex. at 44:05-.50:20.)

---

[6] The "National Democratic Unity Party" is known by the Spanish acronym "PUND."

Meanwhile, Rene's wife Olga has changed her mind about joining him in the U.S. but, as Basulto had warned Rene, she is given the run-around by Cuban authorities when she tries to get an exit visa.  Back in Miami, Rene is being surveilled by the FBI.

The Film shifts to "Four Years Earlier" in Havana, where the Cuban spy agency is preparing to send Lieutenant Hernandez to Florida, under the alias "Manuel Viramontez" ("Viramontez"), to coordinate a network of spies already on the ground – the "Wasp Network." The network includes Rene, Roque and numerous others, including agents in Key West and Tampa. Viramontez collects information gathered by the network and forwards it to Cuba.

Back in the present day, Viramontez returns to Havana to tell Olga, who is finally being permitted to join Rene, the truth about him – *i.e.,* that he is not a traitor, but a hero to the revolution. Olga is stunned.

In Miami, Roque tells Ana that he has to leave early the next morning for a weekend trip. (*See* Comp. ¶ 91.)  At the end of a tense evening, the married couple begins to make love.  (DVD Ex. at 01:05:00-01:09:43.)  The next morning Roque flies off.  Ana tries to call him from her office but gets no answer on his cell phone. She rushes home to find that he has abandoned her, and has purposefully left his cell phone in his Jeep.  (DVD Ex. at 01:10:00-01:11:06.)

The Film then shows pro-democracy demonstrations in Cuba by the Concilio Cubano, as described in the Complaint.  (Comp. ¶¶ 78-79.)  A narrator describes the cruel actions of the Cuban government in response:

> In the fall of 1995, more than 130 independent groups joined forces, calling themselves the Concilio Cubano.  They announced three goals: a peaceful transition to democracy, amnesty for political prisoners, and participation by Cuban exiles in the transition to democracy.  The reprisal was brutal.  The Castro regime attacked Concilio Cubano with all of their strength.  In February they went all out.  They ransacked homes.  They attacked people.  They imprisoned hundreds of human rights activists.  People who didn't have weapons.  People who only aspired to gather peacefully in La Havana.

The film then returns to Miami, where Basulto leads three Brothers planes over Havana, but this expedition ends with Cuban MiGs shooting down the other two planes, as is described in the Complaint.  (Comp. ¶¶ 63-77.)  At home, Ana gets a call from Rene, who first asks for Roque

and then tells Ana to turn on her television, where she sees Basulto talking about the shootdown, followed by President Clinton denouncing the massacre of unarmed planes.  (*See* Comp. ¶¶ 80-83.)  Ana wakes up the next day to find reporters swarming around her home.  Bewildered and scared, she turns on the television to see Roque, back in Havana, giving an interview.  (*See* Comp. ¶ 92.)  He says he returned because he became "frustrated" with American society and the "intolerance" of the Cuban exile community, adding that he was not happy with his life in Miami, where so-called patriots were organizing "terrorist" actions against Cuba. (DVD Ex. at 01:18:10-01:19:25.)  He also says that he warned Basulto that Cuba would eventually shoot down his planes.  Asked what he misses most of his life in Miami, he replies "my Jeep Cherokee."  (Comp. ¶ 97.)  Ana is stunned and hurt, visibly in tears as she processes Roque's betrayal.  (DVD Ex. at 01:19:30-01:19:55.)

Olga and Irma fly to Miami, where they are met by Rene and his grandmother.  Irma is nervous about her new life. Rene is overjoyed by their reunion, but Olga makes clear that she needs time to forgive Rene.  The FBI is watching them.

Rene lunches with Viramontez, who tells him that since Roque's defection, Canosa thinks there are other moles. It is too dangerous for the CANF to plan more attacks on Cuba. Rene and Viramontez want to implicate Canosa in the attacks, but they have no smoking gun. Rene tells Viramontez that Luis Posada Carriles ("Carriles") is now in charge of CANF and that they are recruiting mercenaries in Central America to disrupt Cuban tourism. One such mercenary, Raul Ernesto Cruz Leon, is recruited in El Salvador. He plants bombs that explode in a number of Havana hotels, and is promptly caught by Cuban authorities.

Back in Miami, Viramontez meets Rene, who tells him that Canosa is very sick but that there is a plan to kill Castro at the Ibero-American Summit. Viramontez tells Rene to pass it on to the FBI, in order to catch CANF red-handed.  Olga joins them and tells Viramontez that she is pregnant with a girl.

Apparently armed with the information from Rene, the U.S. Coast Guard stops a boat of men armed with machine guns intended to assassinate Castro.  Soon thereafter, a Cuban emissary at the White House passes on information that CANF is financing mercenaries for terrorism.  At

the emissary's suggestion, the FBI sends a delegation to Cuba to look at information that Cuba has gathered about anti-Castro activities financed by CANF through Carriles.

Carriles gives a New York Times interview about the intelligence Cuba gave to the FBI. He says that Canosa, who has died, did not want to know about Carriles' activities. Carriles says that Cuba should be worried because there is a Cuban spy ring in Miami and the FBI won't tolerate Cuban spies on American soil.

In Miami, Olga has had her baby, and she and Rene are enjoying their new family life until an early morning raid by the FBI to arrest Rene.  Nine other spies, including Viramontez, are also arrested.  Olga, who has been hounded by reporters, visits Rene in prison.

The film then shifts to archival footage of an interview with Castro, who protests that the U.S., which does the most spying, is accusing Cuba, the country most spied upon.  He acknowledges that Cuba sent agents to infiltrate counter-revolutionary organizations in Florida, which he defends as appropriate as long as the U.S. permits people there to organize attacks on Cuban tourism.

Olga takes the baby to visit Rene in prison. She has sent Irma back to Cuba. Rene wants Olga and the baby to go to Cuba, because he won't cooperate with the FBI by testifying against the other spies. She supports him; she plans to stay in the U.S. and visit him so he isn't alone.  Olga drives to Sarasota and tearfully leaves the baby with Rene's grandmother.  Soon after, Olga is arrested.

Fade to black.  Captions state that Olga was deported to Cuba after three months in prison. Rene spent 12 years in prison.  There are also cards describing the fates of Viramontez, Carriles and others, along with a card that states: "Ana Margarita Martinez sued the Cuban government. She was awarded $27 million in punitive damages. To this day, she has collected only $200,000" and one stating that Roque was never a pilot again and, facing money problems, sold his Rolex on eBay.  (DVD Ex. at 02:01:45-02:02:05.)

## THE COMPLAINT

Plaintiff alleges that the Film "romanticizes, or glorifies, the criminal activity" of the Cuban Five and "maligns the Cuban exile community in general." (Comp. at ¶¶ 2, 9.) Plaintiff devotes 56 paragraphs to a "historical background" of "The Cuban Revolution and The Cuban Freedom Fighters," "Brothers to the Rescue," the 1996 shootdown of the Brothers planes and the trial of the Cuban Five. (*See id.* at ¶¶ 25-52, 63-90.)

Plaintiff complains that the Film "delivers a deceptive narrative that attempts to justify the crimes committed by the 'Cuban Five' by describing them as courageous heroes who were defending their homeland," and that it allegedly disparages the Cuban exile community as being "comprised of terrorists and drug traffickers." (*Id.* at ¶ 106.)

Plaintiff claims that "[t]his portrayal of the Cuban exile organizations … is inaccurate" because CANF and Brothers had no connection to "any terrorist attacks against Cuba or drug trafficking activity." Plaintiff further asserts that the Film "fails to show why certain members of the Cuban diaspora chose to establish such civic-society groups abroad" and that it "downplays the level and reach of the Wasp Network's espionage, by attempting to rewrite history in a dishonest and irresponsible way." (*Id.* at ¶¶ 107-09.) "It is against this backdrop," Plaintiff asserts, "where Cuban exiles are … portrayed in a false and negative light." (*Id.* at ¶ 110.)

With respect to the Film's depiction of Roque and his relationship with Plaintiff, Plaintiff alleges that the Film portrays her "as a sexually promiscuous immoral woman, who is involved with drug trafficking and terrorist activities." (*Id.* at ¶ 112.) The Complaint contains the following "specific examples" of what Plaintiff alleges are "false and slanderous scenes":

    a)    The Film falsely imputes on [sic] Ms. Martinez sexually immoral or unchaste conduct and falsely imputing a "party girl" lifestyle, the Defendants strongly reinforced this false narrative by casting Ana De Armas to play Ms. Martinez (Ana De Armas is known for playing roles where she is nude and in sex scenes);

    b)    When Ms. Martinez's character in the Film believes her husband, the covert Cuban spy Roque, is involved in drug trafficking, her character is shown to do nothing except have an emotional outburst – and is therefore depicted as being a willing participant, to enjoy, and help conceal, that the falsely depicted lavish lifestyle was as a result of felony drug trafficking by Roque;

c)        The Film falsely portrays Ms. Martinez as having a lavish lifestyle that is paid for by drug money and terrorist activities, including an extravagant "Godfather style" wedding with high-level leaders of the Cuban-American exile community present, which never actually occurred;

d)        The Film falsely portrays Ms. Martinez as an irresponsible mother who knowingly endangering [sic] her young children by allowing them to be raised in the same home as a drug trafficker and purported terrorist;

e)        In addition to the overtly false portrayal of Ms. Martinez's association with drug trafficking, the Defendants strongly reinforced this false narrative by casting Wagner Moura to play Roque (before Wasp Network, Wagner Moura was primarily known for his starting role in the Netflix series "Narcos," where he played the character Pablo Escobar from 2015-2018);

f)        The Film conceals the fact that Ms. Martinez was a victim of sexual assault conceived and implemented with cold-blooded efficiency by an agent of Cuba's Ministry of the Interior; and

g)        The Film falsely imputes [sic] Ms. Martinez as having been knowingly associated with criminal enterprises that were purportedly engaging in terrorism and drug trafficking.

(*Id.* at ¶ 113.)  Plaintiff also alleges that the Film "disregarded the undisputable factual record established in various judicial and legislative proceedings," including Martinez's litigation against the Cuban government. (*Id.* at ¶ 118.)

Plaintiff asserts four defamation claims – two for defamation *per se* and two *per quod*, each alternatively alleging negligence and "knowing or reckless disregard" – all of which are based on the allegation that the Film portrays Martinez "with a want of integrity in [her] personal life, particularly [the] depiction of [her] ties to 'terrorist cells' and purported drug traffickers."  (*Id.* at ¶¶ 135, 143, 150, 158.)  Plaintiff also alleges a "conspiracy to defame" against defendants Netflix, Orange Studios, S.A. and Olivier Assayas (the latter two of which have not been served). (*Id.* at ¶¶ 164-70.)  Finally, Plaintiff asserts a claim for intentional infliction of emotional distress, alleging that "the Film portrays Roque and the other Cuban spies in a falsely favorable light."  (*Id.* at ¶¶ 171-78.)

## ARGUMENT

To survive a motion to dismiss, a pleading must state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although courts must accept a pleading's factual allegations as true, courts do not "accept as true 'unwarranted deductions of fact' or legal conclusions." *Henry v. Jon*es, 484 F. App'x 290, 291 (11th Cir. 2012) (citation omitted).

"[W]here the facts are not in dispute in defamation cases, pretrial dispositions are 'especially appropriate' because of the chilling effect these cases have on freedom of speech." *Marder v. TEGNA Inc.*, No. 19-81283-CIV, 2020 WL 3496447, at *3 (S.D. Fla. June 29, 2020) (granting 12(b)(6) motion dismissing defamation claim) (quoting *Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 363 (Fla. 4th DCA 1997)). This case presents exactly the sort of "groundless litigation" which should not be permitted to chill protected speech. *Bongino v. Daily Beast Co., LLC*, No. 19-14472-CV, 2020 WL 6470639, at *6 (S.D. Fla. Aug. 6, 2020) ("[T]he Eleventh Circuit acknowledges a 'powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation.'") (quoting *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016)).

### I.     Legal Standard for Defamation Claims

To state a claim for defamation under Florida law, a plaintiff must allege: (1) publication; (2) falsity; (3) that the publisher acted with knowledge or reckless disregard as to the falsity on a matter concerning a public figure, or at least negligently on a matter concerning a private person; (4) actual damages; (5) that the statement is defamatory. *Parekh v. CBS Corp.*, 820 F. App'x 827, 833 (11th Cir. 2020) (citing *Jews For Jesus*, 997 So. 2d at 1105). Where a plaintiff does not allege a literal factual falsehood, but rather defamation "by implication," she must show "(1) a juxtaposition of a series of facts so as to imply a defamatory connection between them, or (2) the creation of a defamatory implication by omitting facts." *Klayman v. City Pages*, 650 F. App'x 744, 749 (11th Cir. 2016) (citation omitted). "Whether the defendant's statements constitute defamation by implication is a question of law for the court to determine." *Turner v. Wells*, 879

F.3d 1254, 1269 (11th Cir. 2018). "True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment." *Id.* (citing *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714–15, 717 (11th Cir. 1985)).

Where, as in this case, a defamation claim is based on a film, the Court should review the film in its entirety to place the allegedly defamatory statement in its proper context. *See Spilfogel v. Fox Broad. Co.*, No. 09-CV-80813, 2010 WL 11504189, at *4 (S.D. Fla. May 4, 2010), *aff'd,* 433 F. App'x 724 (11th Cir. 2011) (granting motion to dismiss claim based on plaintiff's inclusion in *COPS* reality television show "after viewing the episode in its totality."); *Parekh v. CBS Corp.*, No. 19-11794, 2020 WL 3400679, at *3 (11th Cir. June 19, 2020) (evaluating allegedly defamatory statement in television news program "in the context of the publication") (citation & quotations omitted); *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983) ("Articles are to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines.") (citation omitted).

The Eleventh Circuit's opinion in *Parekh v. CBS Corporation* is particularly instructive. In *Parekh*, the plaintiff was involved in a romantic relationship with a woman who, unbeknownst to him, faked having cancer in order to scam supporters into sending her funds for fictitious medical treatments. 820 F. App'x. at 830. After the scam was revealed, Parekh terminated his relationship with the woman, and CBS published a news story regarding the incident. *Id.* at 831. Despite conceding that CBS's story was mostly factually accurate, Parekh nevertheless sued for defamation, alleging that the phrasing of particular statements or the use of old photographs did not make sufficiently clear that Parekh had no part in the woman's scheme. *Id.* at 835. The Eleventh Circuit upheld dismissal of the defamation claim with prejudice, holding that despite the omission of certain factual details that could have painted the plaintiff in a more favorable light, "the 'gist' of the news report is still true—Mr. Parekh did not know that Ms. Deokaran's cancer was a farce until after they moved to Florida, and when he found out, he terminated their relationship." *Id.*; *see also Turner v. Wells*, 198 F. Supp. 3d 1355, 1371 (S.D. Fla. 2016), *aff'd,* 879 F.3d 1254 (11th Cir. 2018) ("A publisher need not include facts in a report simply because they reflect favorably on a subject; nor should that publisher feel coerced into including such facts out

of fear of a defamation lawsuit.") (citation omitted).  While the plaintiff in *Parekh* claimed that the news story at issue there was unclear as to his participation in the woman's scheme, here the Film leaves no doubt that Ana knew nothing of Roque's secret mission.

A review of the Film leads ineluctably to the conclusion that the Complaint's descriptions of scenes that allegedly defame Plaintiff are completely at odds with the actual content of the Film, in which Ana is depicted as a victim of Roque's deception, and as having no affiliation with any criminal activities by either the Cuban spies or any Cuban exile groups. Plaintiff therefore cannot state a plausible claim.

## II.     The Film Contains No Defamatory Depictions of Plaintiff

As a threshold matter, the Film is not a documentary, but a *docudrama*, a common and well-known form of entertainment that viewers recognize as presenting dramatizations that may vary from historical fact even though they are based on true stories.  *See Davis v. Costa-Gavras*, 654 F. Supp. 653, 657-58 (S.D.N.Y. 1987) ("Docudramas utilize simulated dialogue, composite characters, and a telescoping of events occurring over a period into a composite scene or scenes."). As the California Court of Appeal noted in the highly publicized *De Havilland v. FX Networks, LLC*, case, in which famed actress Olivia De Havilland claimed, *inter alia*, that the fictionalized docudrama miniseries *Feud: Bette and Joan* portrayed her in a false light*:* "[v]iewers are generally familiar with dramatized, fact-based movies and miniseries in which scenes, conversations, and even characters are fictionalized and imagined." 21 Cal. App. 5th 845, 866 (Cal. Ct. App. 2018) (striking De Havilland's complaint), *cert. denied*, 139 S. Ct. 800 (2019).  Courts thus recognize that modern day audiences of docudramas understand that they are watching dramatizations, not exacting recreations of events.  As the Ninth Circuit stated in *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995), viewers of such fictionalized fact-based films "would be sufficiently familiar with this genre to avoid assuming that all statements [therein] represent assertions of verifiable facts. To the contrary, most [viewers] are aware by now that parts of such programs are more fiction than fact."

In fact, the Film is consistent with many of Plaintiff's own allegations about her relationship with Roque.  For example:

- Plaintiff met Roque through her church.  (Comp. ¶ 58; DVD Ex. at 21:24-21:53.)

- Plaintiff was completely unaware that Roque was a Cuban spy when she married him, and did not learn otherwise until he abandoned her to return to Cuba.  (DVD Ex. at 01:19:30-01:19:55.)

- Roque abandoned Plaintiff in the middle of the night, and subsequently gave a television interview from Cuba, where he said what he missed most about his life in the United States was his Jeep Cherokee.  (Comp. ¶¶ 91, 97; DVD Ex. at 01:18:10-01:19:55.)

- Plaintiff filed a successful lawsuit against the government of Cuba, which is specifically referenced in the intertitle cards at the end of the Film.  (Comp. ¶¶ 99-100; DVD Ex. at 02:01:45-02:01:51.)

Most important, as set forth below, Plaintiff's allegations regarding supposedly defamatory portrayals of the Ana character in the Film are compellingly refuted by the Film's actual content.

    A.    <u>The Film Does Not Portray or Imply Sexual Immorality on Plaintiff's Part</u>

Plaintiff alleges that the Film falsely depicts Ana engaging in "sexually immoral or unchaste conduct" without identifying any specific scenes. (Comp. ¶ 113(a).)  A review of the Film in its entirety shows that there is *no* depiction of Ana engaging in any conduct that could be described as sexually immoral.  There are only three scenes that depict Ana in any sort of romantic scenario at all.  In the first, Ana is depicted briefly kissing Roque at the conclusion of their first date, and expressly resisting any further advances. (DVD Ex. at 22:30-23:36.)  In another scene, Roque is depicted as carrying Ana into a bridal suite and kissing her on their wedding night.  (DVD Ex. at 50:15.)  And in a scene taking place in their marital home, Ana and Roque begin to make love the night before he is to leave for a weekend trip (or so he tells her).  (DVD Ex. at 1:08:53.)

Nor is there any scene in the Film depicting Ana as "unchaste."[7] At most, the Film depicts Ana living with Roque prior to their wedding ceremony,[8] which does not not constitute defamation as a matter of law, as more than 70 years ago, the Florida Supreme Court held that a publication describing a woman as a "common law wife" or "having lived with a man in a relation of

---

[7] Black Law Dictionary's defines "chastity" as "[t]he condition, state, or principle of not having sex outside marriage."  (11th ed. 2019).

[8] Plaintiff does allege that she, who had been married twice before, and Roque "dated for approximately three years before marrying."  (Comp. ¶ 59.)

concubinage" was *not* inherently defamatory. *See Budd v. J. Y. Gooch Co.*, 157 Fla. 716, 720 (1946).[9]

      B.    <u>The Film Does Not Imply Plaintiff Was Involved in Drug Trafficking or Any Criminal Enterprise</u>

Plaintiff's allegation that she is portrayed as being "involved with drug trafficking and terrorist activities," and as enjoying a lifestyle financed thereby, (Comp. ¶ 113(b)-(c), (g)), is nonsense, as it deliberately misrepresents the plot of the Film and the depictions of Ana and Roque. A review of the full content of the Film shows that Roque afforded his lifestyle – including his Rolex, Jeep and fine clothing – because he was a well-paid FBI informant, not a drug dealer or terrorist.

Plaintiff's allegation that either Roque or Ana (by dint of her relationship with him) is portrayed as involved in drug-trafficking or terrorism finds no support in the Film. Roque is *never* depicted as having any role in drug trafficking or financing of terrorist activities. To the contrary, after Rene expresses his discomfort to Roque about being unwittingly used to facilitate a narcotics transaction, Roque encourages Rene to become an informant for the FBI – spying on the Cuban exile community. (DVD Ex. at 1:35:30 – 1:34:03.) In a subsequent scene where an FBI agent recruits Rene to become an informant, he offers Rene $1,500 per week and tells him his "friend Juan Pablo Roque has been working for us for a year, for the same money." In response, Rene chuckles and says, "Now I get it . . . [Roque's] lifestyle." (DVD Ex. at 34:16 – 35:00.) The implication is clear; Roque's lifestyle is financed by the FBI, not by drug money or terrorist organizations. The Film also depicts a confrontation between Ana and Roque, in which his expensive tastes lead her to suspect that he is making money from "drugs."[10] Roque tells her, in

---

[9] At the same time that Plaintiff complains about the depiction of sex scenes, she paradoxically alleges that the Film "conceals the fact that [she] was a victim of sexual assault conceived and implement with cold-blooded efficiency by an agent of Cuba's Ministry of the Interior." (Comp. ¶ 113(f).) With respect to the latter allegation, the Film leaves no doubt about Roque's "cold-blooded" deception of Ana. It also states prominently at the end that Martinez sued the Cuban government for her abuse by Roque, and won a $27 million judgment.

[10] Contrary to the characterization in the Complaint, the Film does not depict Ana as being a "willing participant" who "help[s] conceal . . . felony drug trafficking by Roque." (Comp. ¶ 113 (b)). Rather, Ana is shown to confront Roque regarding her suspicions, and the argument only ends when Roque explicitly – and truthfully – denies having any ties to drug trafficking.

no uncertain terms (and truthfully), that he is *not* involved in drug trafficking, followed by "but you don't know everything about me and it's better for you that way" – a clear allusion to his activities as an informant.  (DVD Ex. at 38:00 – 41:02.)

Plaintiff's allegation that the Film portrays an "extravagant 'Godfather style' wedding" that is "paid for by drug money and terrorist activities," (Comp. ¶ 113(c)), also bears no relation to what actually unfolds onscreen.  The Film depicts a fairly lavish wedding (which is not itself defamatory), but in no way, express or implied, indicates that the wedding was financed with money from narcotics trafficking.[11]

   C. <u>The Film Does Not Depict Plaintiff As "An Irresponsible Mother"</u>

While Plaintiff alleges that the Film "falsely portrays" Ana as "an irresponsible mother who knowingly endangering [sic] her young children by allowing them to be raised in the same home as a drug trafficker and terrorist,"(Comp. ¶ 113(d)), she wholly ignores the fact that *the Film does not portray Ana as a mother at all*. There is not a single statement about Ana having children. Plaintiff cannot base a defamation claim on aspects of the Film that do not exist.

**III. The Casting of Particular Actors Does Not Support A Cognizable Defamation Claim**

Highlighting the strained nature of her claims, Plaintiff also alleges that the use of particular actors in the Film who had previously appeared nude (*i.e.,* Ana de Armas as Ana) or portrayed criminals (*i.e.,* Wagner Moura as Roque) in separate, unrelated films or television shows constitutes a defamatory statement as to Plaintiff.  (Comp. ¶¶ 113(a), 113(e)).  This novel theory would create an entire new species of defamation law, whereby a court would be required to consider a particular actor's history of past roles, and then declare that the use of that actor implies, for example, "criminal" or "sexually immoral" behavior by the characters they subsequently portray in *other*, *unrelated* works.[12]  This absurd proposition should be firmly rejected.

---

[11] Plaintiff does not identify what scene allegedly imputes a "party girl" lifestyle to Plaintiff. (Comp. ¶ 113(a)).  During the wedding sequence, Ana is depicted salsa dancing during the reception, but the Complaint utterly fails to explain how depicting a bride dancing at her wedding implies a defamatory "party girl" lifestyle.

[12] Plaintiff's novel theory proposes to open a Pandora's box regarding an actor's prior roles. For example, the film *Erin Brokovich*, starring Julia Roberts, was based on a real person of that name. Would the casting of Julia Roberts for the title role constitute defamation because of her famous

## IV.     Plaintiff's Group Libel Allegations That the Film Defames the Cuban Exile Community Are Not Actionable

Plaintiff's Complaint is rife with allegations that "the Film maligns the Cuban exile community in general." (Comp. ¶ 9; *see also id*. ¶¶ 106-08, 110-11.) [13] Such allegations of group libel are not legally cognizable. "Florida and federal cases dealing with group defamation consistently hold that a cause of action for group libel cannot be maintained unless it is shown that the libelous statements are 'of and concerning' the plaintiff." *Thomas v. Jacksonville TV, Inc.*, 699 So. 2d 800, 805 (Fla. Dist. Ct. App. 1997) (citing *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669 (1966)). In *Thomas*, the plaintiffs alleged that an advertisement created by Save Our Sealife defamed a group of 436 commercial fisherman by accusing them of inhumane treatment of marine life. *Id*. at 802-03. Although that group was much smaller and more narrowly defined than the community of Cuban-exiles living in Florida, the court nevertheless held that the plaintiffs were unable to meet the threshold requirement that the allegedly defamatory statement was "of and concerning" a particular individual. *Id*. at 805; *see also Diaz v. NBC Universal, Inc.*, 536 F. Supp. 2d 337, 343 (S.D.N.Y. 2008), *aff'd*, 337 F. App'x 94 (2d Cir. 2009) (dismissing putative class action on behalf of 400 agents of the United States Drug Enforcement Agency alleging unfavorable depiction in the film *American Gangster* because there was no defamatory statement "of and concerning" a particular agent); *Adams v. WFTV, Inc.*, 691 So. 2d 557, 557 (Fla. Dist. Ct. App. 1997) (dismissing defamation claim alleged on behalf of group, and collecting cases regarding how small group must be for defamation to be actionable). [14]

---

previous portrayal of a prostitute in *Pretty Woman*? Taken to its logical conclusion, Plaintiff's argument would have a chilling effect on actors, discouraging them from taking on controversial "criminal" or "immoral" roles for fear of being excluded from subsequent protagonist roles.

[13] Plaintiff alleges in Paragraph 110 of the Complaint that that the Film portrays the Cuban exile community in a "negative light." To the extent Plaintiff intends to invoke the doctrine of "false light" as a form of defamation, such a claim fails because the Florida Supreme Court has explicitly rejected false light as an independent cause of action. *Jews for Jesus*, 997 So.2d at 1115.

[14] Plaintiff also alleges that the Film shows "favoritism" towards the Cuban regime. (Comp. ¶ 109.) But accusations that a work "romanticizes" characters who committed crimes (Comp. ¶ 109), or "fails to show" a sufficiently positive history of Cuban-exile civic society groups (Comp. ¶ 107), do not support Plaintiff's defamation claims, because they do not concern false and defamatory statements *about Plaintiff*.

**V.      Plaintiff's "Conspiracy to Defame" Claim Also Fails**

Because the Complaint fails to state a legally sufficient claim for defamation, Plaintiff's fifth count for "Conspiracy to Defame" should also be dismissed. *See Thomas v. Patton*, No. 162005CA003777XXXXMA, 2005 WL 3048033, at *4 (Fla. Cir. Ct. Oct. 21, 2005), *aff'd and remanded,* 939 So. 2d 139 (Fla. Dist. Ct. App. 2006) ("Without a defamation, there can be no conspiracy to defame."); *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, No. 6:08CV466-ORL-28GJK, 2010 WL 1408391, at *24 (M.D. Fla. Apr. 6, 2010), *aff'd,* 451 F. App'x 862 (11th Cir. 2012) ("The underlying tort on which this count is based is defamation, and, as concluded earlier in this Order, no actionable defamation claim has been stated.").

**VI.     Plaintiff Has Not Alleged Conduct "Beyond All Possible Bounds of Decency" Necessary to Support an Intentional Infliction of Emotional Distress Claim**

To establish a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must allege conduct by the defendant "so outrageous in character, and so extreme in degree, that it is considered atrocious and utterly intolerable in a civilized community." *Piccolo v. Piccolo*, No. 15-CV-62463, 2016 WL 9526494, at *3 (S.D. Fla. May 6, 2016) (quoting *Thomas v. Hosp. Bd. of Dirs. of Lee Cnty.*, 41 So.3d 246, 256 (Fla. 2d DCA 2010)).  "Whether a claim pleads conduct sufficiently outrageous to support a claim of IIED is a question of law that a court may consider at the motion to dismiss stage and is measured by an objective standard; the subjective response of the person who allegedly suffered emotional distress does not control." *Piccolo*, 2016 WL 9526494, at *3 (citation omitted).

Plaintiff asserts that the Film's depiction of her relationship with Roque constitutes IIED because Netflix was allegedly aware of the "extreme psychological and emotional distress" Plaintiff had suffered because of Roque's actions at the Cuba government's behest.  (Comp. ¶¶ 171-178.)  That claim fails as a matter of law.

Even in cases where statements directed at an individual can sustain a valid defamation claim (which Plaintiff is unable to do here), federal courts applying Florida law routinely find that such statements do not meet the high threshold of "outrageous" conduct necessary to sustain an

IIED claim. *E.g.*, *Koutsouradis v. Delta Air Lines, Inc.*, 427 F.3d 1339, 1345 (11th Cir. 2005) (noting "obscene and sexually explicit comments, verbal invitations for sex, questions as to a plaintiff's sexual behavior, sexually suggestive gestures and the like do not rise to a level sufficient to support" IIED claim under Florida law); *Foreman v. City of Port St. Lucie,* 294 Fed. App'x. 554, 556–57 (11th Cir. 2008) (plaintiff's allegation that police officer pointed BB gun, which she did not know was empty, at her husband's chest and pulled the trigger did not establish intentional infliction of emotional distress under Florida law).

In *LeGrande v. Emmanuel*, for example, the defendant told members of a church congregation that the plaintiff pastor stole money from the church to buy a Mercedes. 889 So. 2d 991, 993 (Fla. Dist. Ct. App. 2004). While the Florida appellate court held that this statement accusing the minister of criminal conduct could support a defamation claim if proved false, it went on to hold "[a]lthough we recognize that being branded a thief in front of one's parishioners might certainly be unsettling, embarrassing, and/or humiliating for a member of the clergy, we do not believe that this alleged conduct is the type of extreme and outrageous conduct needed to support a claim for the intentional infliction of emotional distress as a matter of law." *Id.* at 995.

Plaintiff's allegations—even if true—fall far short of the well-established standard for "outrageous" conduct, and Plaintiff's IIED claim must therefore be dismissed. Plaintiff's IIED claim is premised on her allegation that the Film does not portray Roque's deception of Ana in a sufficiently harsh light, [15] and merely recites in conclusory fashion that this depiction is "outrageous and beyond all bounds of decency." (Comp. ¶¶ 175-76.) But the notion that an IIED claim could be premised on such allegations is contradicted by a litany of cases. *E.g.*, *Pierre v. City of Miramar, Fla., Inc.*, 537 F. App'x 821, 827 (11th Cir. 2013) ("The standard for outrageous conduct is particularly high in Florida.") (quoting *Clemente v. Horne,* 707 So.2d 865, 867 (Fla. Dist. Ct. App. 1998)) (quotations omitted); *Langbehn v. Pub. Health Tr. of Miami-Dade Cty.*, 661 F. Supp. 2d 1326, 1344 (S.D. Fla. 2009) (allegation of restricting life partner's access terminally

---

[15] The Film leaves no doubt that Roque deceives and uses Ana, and then leaves her devastated when he abandons her and then states in an interview, after his surreptitious return to Cuba, that he misses only his Jeep Cherokee.

ill patient at end of life could not sustain IIED claim); *Lay v. Roux Labs., Inc.*, 379 So. 2d 451, 452 (Fla. Dist. Ct. App. 1980) (use of n-word racial epithet in dispute over parking space did not rise to level of IIED).  An individual's purported offense at a docudrama cannot be actionable, or the First Amendment's protections for such works would be meaningless.  Taken to its logical extreme, the families of people who had been scarred by violent, but historic, actions against their loved ones [16] could sue filmmakers for IIED, which would make it impossible to produce docudramas about historical events.

<u>**CONCLUSION**</u>

Docudramas like the Film that concern politically-charged matters tend to be approved by some groups and rejected by others.  In *Federation of Turkish-Am. Societies v. American Broad. Cos.*, 620 F. Supp. 56 (S.D.N.Y. 1985), Turkish-American groups asserted civil rights and emotional distress claims concerning the film *Midnight Express*, which offered a harsh portrayal of Turkish culture.  The court noted that "[t]he First Amendment protects the offensive utterance fully as much as it protects the bland or controversial.  In a free society, it cannot be otherwise." *Id.* at 58.  In dismissing the claims as a matter of law, the court stated that Turkish-Americans "must recall that one of the very freedoms which, by their exodus they have obtained for themselves and their children, is that very freedom of speech which … entitles the defendants to summary judgment dismissing this complaint." *Id.* at 59.  That holding applies with equal vigor here.  The Cuban exile community, including Plaintiff, fled Castro's government in order to be part of a society that enjoys the freedom of speech that protects controversial artistic expression such as the Film.

For all the reasons set forth above, Netflix respectfully requests that its motion to dismiss the Complaint, with prejudice, be in all respects granted.

---

[16] By way of example, this would include the families of John F. Kennedy, Martin Luther King, Jr., Robert F. Kennedy, Malcolm X and the multitude of victims of the Ku Klux Klan.

**REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), Netflix respectfully requests oral argument on its dismissal motion. Due to the multiple underlying scenes in the Film upon which Plaintiff premises her claims, and the audio-visual nature of the components at issue, oral argument would be of assistance to the Court. Netflix anticipates that oral argument will necessitate thirty (30) minutes.

Dated: January 11, 2021

**PRYOR CASHMAN LLP**

*Attorneys for Netflix, Inc.*
Tom J. Ferber (admitted *pro hac vice*)
James G. Sammataro
201 South Biscayne Boulevard, Suite 2700
Miami, Florida 33131
Telephone: (786) 582-3011
Facsimile:  (786) 582-3004

*s/ James G. Sammataro*
Florida Bar No. 520292

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on January 11, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send Notices of Electronic Filing to all counsel of record.

*s/ James G. Sammataro*
James G. Sammataro