## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-cv-24328-COOKE/MCALILEY

ANA MARGARITA MARTINEZ,

      Plaintiff,

v.

NETFLIX, INC.,
ORANGE STUDIOS, S.A., and
OLIVIER ASSAYAS

      Defendants.

_____/

### FIRST AMENDED COMPLAINT

     Plaintiff, ANA MARGARITA MARTINEZ ("Plaintiff" or "Ms. Martinez"), by and through undersigned counsel, hereby files her First Amended Copmlaint against Defendants, NETFLIX, INC., ORANGE STUDIOS, S.A. and OLIVIER ASSAYAS, (collectively, "Defendants") and alleges as follows:

### NATURE OF ACTION

    1)   This defamation action arises from Defendant Netflix, Inc.'s ("Netflix") release of the film *The Wasp Network* (the "Film") to its worldwide streaming service on June 19, 2020. Since then, the Film has been accessed by, and remains accessible to, more than 192 million Netflix subscribers and viewers.[1]

    2)   The Film romanticizes, or glorifies, the criminal activity conducted by agents of Cuba's Ministry of the Interior, i.e., the "Cuban Five," whose espionage work was responsible for the death of four Americans in 1996, as being based on "True Events."

---

[1]      https://www.netflixinvestor.com/financials/sec-filings/default.aspx

*Martinez v. Netflix, et al.*

3)   In doing so, the Film attempts to rewrite history in a dishonest and irresponsible way by legitimizing and justifying the communist Cuban government's crimes of espionage against the United States; crimes of fraud, sexual battery, and rape against Ms. Martinez; and acts of terrorism in shooting down two unarmed civilian planes operated by *Hermanos al Rescate* ("Brothers to the Rescue") on Saturday, February 24, 1996 during a humanitarian mission to search for and aid Cuban refugees fleeing on rafts in the Straits of Florida.

4)   The Castro regime's statements that Brothers to the Rescue was engaged in covert operations, bombing campaigns, and commando operations in Cuba have no basis in fact.

5)   The Film is straight out of the Cuban regime's 'playbook' and is 'now playing' and being promoted under the guise of being "Based on True Events" or "based on a true story."

6)   However, the Film is not based on any non-fiction literature or any other work purporting to depict "true events," instead it was scripted from Brazilian author Fernando Morais' spy-thriller novel, *The Last Soldiers of the Cold War*. Further, the Film was filmed in large part in Cuba with the permission and oversight of the totalitarian Cuban Communist Party.

7)   A significant portion of the Film portrays Ms. Martinez, played by actress Ana de Armas, in a false and defamatory manner. The Film's portrayal of Ms. Martinez cannot be justified as the mere use of artistic license or dramatization.  In the Film, which Defendants have marketed and promoted as being based on "True Events", Defendants depict Ms. Martinez, under her own name, as a sexually immoral individual, who lives a

lavish lifestyle paid for by drug money and terrorist activities, and who had associated herself with criminal and/or terrorist enterprises. The Film does not disclose the fact that Ms. Martinez was a victim of a brutal and premeditated crime committed by Cuba's Ministry of the Interior or that she was a devoted loving mother with two young children who developed a close relationship with the Cuban agent and experienced insurmountable trauma as a result of the premeditated crime. Furthermore, the Film glamorizes Ms. Martinez's life as one of leisure and comforts when in reality she was a hard working mother who oftentimes bankrolled the life of Cuba's agent when he was out of work.

8)   Ms. Martinez was falsely portrayed in the Film. She is a Cuban exile who has experienced the brutality of Fidel Castro's ("Castro") communist regime first-hand. Notably, the Film shows false and slanderous scenes that: (i) falsely impute on Ms. Martinez sexually immoral or unchaste conduct; (ii) falsely portray Ms. Martinez as having a lavish lifestyle paid for by drug money and terrorist activities, including an incredibly false portrayal of Ms. Martinez's wedding; (iii) conceal the fact that Ms. Martinez was a victim of a premeditated crime conceived and implemented by agents of Cuba's Ministry of the Interior; and (iv) impute on Ms. Martinez as having been associated with criminal and/or terrorist enterprises. Based on the Defendants' portrayal of Ms. Martinez's character in the Film, Defendants are willfully damaging Ms. Martinez's name and reputation while re-traumatizing her by bringing to fore events of the past that significantly disrupted the course of her life.

9)   Defendants acted with actual malice when publishing the Film because they knew that the portrayal of Ms. Martinez in the Film, and statements and conduct

*Martinez v. Netflix, et al.*

attributed to her, were false.  At a minimum, Defendants exercised a reckless disregard for the manner in which Ms. Martinez was depicted in the Film by failing to conduct appropriate diligence of publicly available information with respect to the actual and accurate historical facts of her story and instead opting to use a staggering amount of false information to develop her character, which was entirely fabricated with no basis in fact. Additionally, Ms. Martinez did not have any involvement with the production of the Film and was never consulted with respect to the events depicted therein. The untruthful depiction of Ms. Martinez being a member of a "terrorist cell" of Cuban exiles has caused irreparable harm to Ms. Martinez, her name, and her reputation.

10)   Not only does the Film depict Ms. Martinez in a false and defamatory manner, but while doing so, the Film maligns the Cuban exile community in general.  Many of these exiled individuals were driven from Cuba, largely owing to their own government's repression.  By way of further example, the writer and director of the Film, Assayas, allowed his characters to refer to legitimate political dissidents with the official label of "*gusanos*" (a derogatory Spanish word used by the totalitarian communist Cuban regime to describe those who did not agree with Castro's policies and were essentially considered "traitors" of the revolution).

11)   Defendants led the public to believe that the Film is a true and accurate account of what occurred, and all marketing and promotion of the Film conducted by Defendants further reinforce the "truth" of the account presented in the Film.

12)   Given the sheer volume of facts in the public record that directly contradict the manner in which Ms. Martinez is portrayed in the Film, Netflix's marketing and promotion of the Film as a truthful account of what occurred is both knowingly false and

*Martinez v. Netflix, et al.*

defamatory, as well as unconscionable. For example, the Film disregards the factual record established in various judicial and legislative proceedings, including, without limitation: *Martinez v. Republic of Cuba*, Eleventh Judicial Circuit Court in and for Miami-Dade County, Case No. 99-18208-CA-20; US Congressional findings encoded at 22 U.S. Code § 6046, titled "Condemnation of Cuban attack on American aircraft"; and *United States v. Hernandez, et al.*, 124 F.Supp.2d 698 (S.D. Fla. 2000). Additionally, Netflix has previously been urged by the Assembly of the Cuban Resistance to correct the untruthful and defamatory portrayals of the Cuban exiles in the Film that were untruthfully touted as being "Based on True Events."

13)   Based on the foregoing, Netflix has expressly sought to mislead its viewers to believe that the Film's portrayal of Ms. Martinez, as a member of the Cuban exile community, is accurate in form and substance.  In reality, however, the portrayal of Ms. Martinez in the Film is completely fabricated.  When marketing and promoting the Film as "Based on True Events," Netflix and its agents knew that the portrayal of Ms. Martinez was false and defamatory, and at a minimum, Netflix acted with reckless disregard in wrongfully assailing Ms. Martinez.

14)   As a result of Netflix's publication of the Film, which continues to stream on its platform, and its representations that the Film is "Based on a True Story" (despite the fact that the source material for the Film is not non-fiction literature, but rather fictional drama), Netflix has defamed Ms. Martinez and caused harm to her name and reputation.

*Martinez v. Netflix, et al.*



15)  Defendants' defamatory accusations have caused and continue to cause Ms. Martinez irreparable harm.

16)  Ms. Martinez now files this defamation action to set the record straight, to vindicate her rights under civil law, and to recover actual damages, punitive damages, and injunctive relief against Defendants.

<u>**PARTIES**</u>

17)  Plaintiff, ANA MARGARITA MARTINEZ, is a natural person and a resident of Miami-Dade County, Florida for over four decades.

18)  Defendant, NETFLIX, INC., is a public corporation incorporated under the laws of the State of Delaware, and its principal place of business located at 100 Winchester Circle, Los Gatos, California 95023. Netflix is registered to do business in Florida. According to Netflix's 10-Q for the period ended June 30, 2020, they are "… the world's leading subscription streaming entertainment service with over 192 million paid streaming memberships in over 190 countries enjoying TV series, documentaries and feature films across a wide variety of genres and languages."[2]  In that quarter, Netflix

---

[2]     https://www.netflixinvestor.com/financials/sec-filings/default.aspx

*Martinez v. Netflix, et al.*

provided its subscription based streaming service to 72.9 million U.S. subscribers, including many who are in the State of Florida.[3]

19)   Defendant, ORANGE STUDIOS, S.A. is a French anonymous society headquartered in France. Orange Studios, S.A. is the producer of *The Wasp Network*.

20)   Defendant, OLIVIER ASSAYAS,  is a filmmaker presently residing in France. Assayas is the writer and director of *The Wasp Network*.

## JURISDICTION AND VENUE

21)   This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs; and the parties are of diverse citizenship.

22)   The Court has personal jurisdiction over Netflix:

a)      pursuant to Section 48.193(1)(a)(1), Florida Statutes, because the causes of action arise from Netflix "operating, conducting, engaging in, or carrying on a business venture in this state."

b)      because Netflix continuously and systematically does business in Florida by streaming its content to subscribers residing in Florida, offering subscriptions to Florida residents via its website, engaging in film production activities in Florida, and premiering its original content in Florida.

c)      pursuant to Section 48.193(1)(a)(2), Florida Statutes, because the causes of action arise from Netflix "committing a tortious act within this state" by releasing *The Wasp Network* for viewing on its website, which contains false

---

[3]      https://www.statista.com/statistics/250937/quarterly-number-of-netflix-streaming-subscribers-in-the-us/

*Martinez v. Netflix, et al.*

and defamatory statements about Ms. Martinez, and was, and continues to be, accessed by Netflix's Florida subscribers.

      d)      pursuant to Section 48.193(1)(a)(6), Florida Statutes, because the causes of action arise from Netflix "causing injury to persons...within this state arising out of an act or omission by [Netflix] outside this state" and "at or about the time of the injury" Netflix was "engaged in solicitation or service activities within the state," and "products...processed, serviced, or manufactured anywhere" by Netflix "were used or consumed within this state in the ordinary course of commerce, trade, or use."

      e)      pursuant to Section 48.193(2), Florida Statutes, because Netflix is engaged in substantial and not isolated activity within Florida, and therefore, Netflix is subject to the jurisdiction of the court of this state.

23)  The Court has personal jurisdiction over Defendants Orange Studios, S.A. and Mr. Assayas because the causes of action alleged against them arise from their commission of a tortious act within Florida by participating in, facilitating and causing the publication of defamatory content on Netflix's website, namely *The Wasp Network*, for which Orange Studios, S.A. served as the producer and Mr. Assayas served as writer and director, and which contains false and defamatory statements about Ms. Martinez and was, and continues to be, accessed in Florida by Netflix subscribers. *See* Section 48.193 (1)(a)(2), Florida Statutes. *See* Section 48.193 (1)(a)(2), Florida Statutes. Further the causes of action arise from Orange Studios, S.A. and Mr. Assayas conspiring with Netflix to portray Ms. Martinez in a false and defamatory manner in *The Wasp Network*.,

as alleged in Count V. *See Execu-Tech Business Sys., Inc. v. New Oji Paper Co., Ltd.*, 752 So. 2d 582 (Fla. 2000); *Wilcox v. Stout*, 637 So. 2d 335 (Fla. 2d DCA 1994).

24)   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because this is the judicial district where a substantial part of the events or omissions that gave rise to the claims occurred.

25)   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the instant claim occurred in the Southern District of Florida where Ms. Martinez resides and where a substantial number of readers and potential readers who know and associate with Ms. Martinez are located who have viewed *The Wasp Network*, or seen attendant press coverage or social media posts about the same. Venue pursuant to 28 U.S.C. § 1391(b)(2) is also proper because this Court has personal jurisdiction over Defendants.

**FACTS RELEVANT TO ALL CLAIMS**

**I.   HISTORICAL BACKGROUND**

      **a.   THE CUBAN REVOLUTION AND THE CUBAN FREEDOM FIGHTERS**

26)   On the early morning of January 1, 1959, Cuban dictator Fulgencio Batista escaped to the Dominican Republic.

27)   The next day Castro occupied Santiago de Cuba.  By January 5th, his rebel army was in control of the military bases in Cuba.  By January 8th, Castro entered Havana as the leader of the Cuban Revolution.

28)   Within 30 days of victory, most officers and soldiers of the defeated army were discharged, exiled, incarcerated, subjected to cruel and inhumane treatment and killed via firing squad campaigns.  In some cases, by grotesque, circus-like televised trials and executions.  On January 13th, five days after he had marched into Havana, Castro's

Council of Ministers approved into law the death penalty, and Cuba's Ministry of the Interior was founded on June 6, 1961 as a deadly and brutal force that suppressed all in opposition of Castro with shocking levels of violence.

29)   On March 3, 1959, a group of 43 pilots and mechanics of Batista's air force were accused of war crimes.   Presiding over the tribunal was a hero of the revolution Comandante Felix Pena, who fought against Batista in Santiago and later in the Sierra Cristal.

30)   The Court found that the evidence presented by the prosecution was inadequate and they were acquitted.   Castro was outraged by the tribunal's verdict and immediately went on TV to accuse the Revolutionary Court of being mistaken.   He ordered a retrial.   He claimed that when a verdict was unjust, the revolution had the right to appeal.

31)   A new tribunal was immediately appointed.   Swiftly, the airmen were found guilty and sentenced to 30 years in prison and ten years of forced labor.   Felix Pena was found shot to death.   Castro was direct and to the point.   He stated that "[r]evolutionary justice is based not on legal precepts but on moral convictions" – a most tragic travesty for the judicial process in Cuba.

32)   On November 1959, ten months after taking power, Castro instructed a young Marxist, Hector Rodriguez Lompart, his Undersecretary of Commerce, to establish a direct link with Anastas Mikoyan, the first Deputy Chairman of the Soviet Union. Rodriguez Lompart met with Mikoyan and arranged for a visit by the cunning Bolshevik to Havana.

*Martinez v. Netflix, et al.*

33)   On February 5, 1960, Mikoyan arrived in Havana and met with Castro.  They reached a crucial economic and political agreement.  In 1960, the Soviet Union was to purchase 425,000 tons of sugar at the world price and one million tons of sugar each year for the following four years.  The era of Castro's close economic and military links with the communist Russia was dawning.

34)   On May 17, 1960, the three large oil refineries in Cuba – Standard Oil, Texaco, Royal Dutch (Shell) – were ordered by Castro to process Russian oil.  The refineries refused.  On June 29, 1960, Castro confiscated the three refineries.

35)   On August 6, 1960, Castro confiscated several U.S. owned corporations, including electrical and telephone companies and 36 sugar mills.

36)   By October, the revolution confiscated Cuban owned corporations, including Bacardi, financial institutions, sugar mills, cattle ranches, mining operations, theaters, and hotels.  It took Castro a quick 22 months to bury individual freedom and private ownership of property in Cuba.

37)   On October 18, 1960, President Dwight Eisenhower recalled the U.S. ambassadors and the next day imposed an embargo on all export from the United States to Cuba.

38)   The Eisenhower administration was now ready to listen to the Central Intelligence Agency's ("CIA") recommendation that military assistance be provided to the Cuban exiles in Miami and the Cuban underground.  Greatly concerned with the Soviet Union's presence in Cuba, President Eisenhower issued a warning that "[t]his nation cannot and will not tolerate the establishment of a Soviet satellite ninety miles from our shores."  *See* Graystone Lynch, DECISION FOR DISASTER, Washington: Brassey's, 2000.

39)   On March 17, 1960 ("March 17 meeting"), President Eisenhower authorized the CIA to develop a plan to overthrow the Castro regime.

40)   At the March 17 meeting at the White House, the President gave the green light for the CIA to create a Cuban exile military force to be trained for the deployment in Cuba.

41)   On August 18, 1960, the Eisenhower administration approved a $13 million dollar budget for covert operations in Cuba.  The Cuban freedom fighters inside the island did create a large and effective clandestine network.  They fought with heroic courage.

42)   As the clandestine operation grew, the need to setup supply bases in the Florida Keys became clear as well as to provide extensive training to a hand-picked group of men in the complex skill of covert operations.  The Florida Keys became the main operational base of the maritime crews and the infiltration teams.  As the Union of Soviet Socialist Republics ("Soviet Union.") began to increase their supply of weapons to Cuba, the Eisenhower administration decided to go for a powerful knockout punch with a well-trained and equipped assault brigade that would establish and hold a beachhead for further operations (the genesis of the Bay of Pigs).

43)   In response to the failed Bay of Pigs invasion of 1961, the Soviet Union agreed to Cuba's request to place nuclear missiles on the island pointed at the United States.

44)   From 1960 to 1972, hundreds of CIA-sponsored clandestine operations were carried on by Cuban exiles from Miami and the Florida Keys.

45)   On October 1971, one of the CIA's last maritime operations was directed at "Boca de Sama" inlet near the city of Banes in the Northern coast of Oriente.

46)  By 1972, the CIA's Cuban maritime and infiltration teams were placed in a reserve status.

47)  In 1976, they were permanently retired, and active clandestine operations were cancelled by the CIA.[4]

### b.  BROTHERS TO THE RESCUE

48)  Brothers to the Rescue (in Spanish, "Hermanos al Rescate") is a Florida not-for-profit corporation that was formed in 1991 by Mr. Jose Basulto, a Bay of Pigs veteran who has served as its President from its inception through the present.

49)  Brothers to the Rescue is a pro-democracy, humanitarian organization. Its stated mission "is to promote and support the efforts of the Cuban people to free themselves from dictatorship through the use of active nonviolence."

50)  An integral part of the Brothers to the Rescue effort is to save the lives of refugees escaping the island of Cuba and to assist the families of political prisoners.

51)  Brothers to the Rescue conducted extensive humanitarian missions searching for rafters in the Florida Straits, through the efforts of a group of pilots, observers and volunteers from numerous countries.

52)  Brothers to the Rescue engaged in humanitarian work that conducted over 2,400 aerial search missions, resulting in the rescue of more than 4,200 Cuban rafters consisting of men, women and children ranging from a five-day old infant to an elderly man of 79 years of age.

---

[4] In 1976, all of the CIA operational facilities were dismantled.  The clandestine operations of the Cuban Freedom Fighters in Miami and the Florida Keys became abruptly illegal. As a result, the totalitarian regime in Cuba deployed a terrorist offensive to turn Central America into the principal battleground  It is obvious that Cuban spies in South Florida (1990 – 1998) were at the wrong place and wrong time.

*Martinez v. Netflix, et al.*

53)   It has been estimated that Brothers to the Rescue pilots have saved one life for every two hours of flight time.  This is considered a record rate among professional search and rescue organizations, such as the Civil Air Patrol and the United States Air Force.[5]

c.   <u>ANA MARGARITA MARTINEZ AND JUAN PABLO ROQUE</u>

54)   Ms. Martinez was born in Havana, Cuba.  Along with her mother and grandmother, she fled Cuba as a young child during the Freedom Flights Exodus in 1966.

55)   In the early 1990s, Ms. Martinez lived in Miami, Florida and was a typical hard working single-mother with two young children who attended church regularly.

56)   Unbeknownst to her at the time, in 1992 her life was about to be forever altered as a result of an unlawful and Machiavellian espionage operation by the communist Cuban government.

57)   In February 1992, the government of Cuba sent its agent, Juan Pablo Roque ("Roque"), a Soviet-trained spy and MiG pilot and Major in the Cuban Air Force, to the shores of Guantanamo, claiming to be a high-ranking defector from Cuba.

58)   Roque swam to the U.S. Military base in Guantanamo, Cuba, claiming to be a high-ranking military defector from Cuba.

59)   After being debriefed by U.S. officials in Guantanamo, Roque arrived in Miami during March 1992.  He began attending the same church as Ms. Martinez.  She saw him regularly at religious services and church events.  They met formally at a church group event during May 1992 and began dating shortly thereafter.

---

[5] Additionally, there have been flights to drop food and water supplies to stranded rafters in deserted Bahamian Islands, as well as weekly deliveries of emergency food, medicine and clothing to a Cuban refugee detention camp in Nassau, Bahamas.  The organization has also conducted search missions for survivors of shipwrecks of U.S. citizens, Bahamians, Haitians and missing divers.

*Martinez v. Netflix, et al.*

60)   Acting on instructions from Cuba, Roque pursued Ms. Martinez and asked for her hand in marriage within the first six months of their relationship. Ms. Martinez was cautious in allowing Roque into her life and the lives of her children.  She had been hurt by previous relationships and was careful about starting a new one.  She was concerned, wanted to protect her children and avoiding having them any pain or suffering as a result of a newcomer joining the family.  She had been married before and her children were from her second marriage (a fact Roque knew well and for which he understood the implications for Ms. Martinez). Ms. Martinez and Roque dated for approximately three years before marrying.

61)   During that time, Roque established himself as a presumed anti-Communist member of the Cuban exile community in Miami.  The entire time, Ms. Martinez was unaware that Roque was using her as an unwilling pawn to legitimize his presence in Miami by establishing a credible cover for his covert espionage on behalf of the Cuban government.

62)   Aided by the cover provided by his relationship with Ms. Martinez, Roque infiltrated Miami-based organizations that had humanitarian missions directed toward helping and promoting democracy in Cuba. He gained admission into exile organizations and even obtained the sponsorship of the Cuban American National Foundation (CANF) for the publishing of his book,  "Desertor" ("*The Defector*").  The book was published in 1995 and describes Roque's life in Cuba generally and his military career.

63)   During 1994, Roque joined the Brothers to the Rescue organization in Miami. As a former MiG fighter pilot with the rank of Major in the Cuban Air Force, Roque joined

Brothers to the Rescue as one of its pilots.  He flew on many scouting missions with the Brothers.

    d. <u>THE 1996 ASSASSINATION OF 4 BROTHERS TO THE RESCUE PILOTS</u>

64) On Saturday, February 24, 1995, three civilian Brothers to the Rescue planes flew a humanitarian mission, searching for Cuban refugees in the Straits of Florida.

65) The members of Brothers to the Rescue were flying unarmed and defenseless planes in a mission identical to hundreds they had flown since 1991 and posed no threat to the Cuban government, military, or people.

66) Statements by the Cuban Government that Brothers to the Rescue had engaged in covert operations, bombing campaigns, and commando operations against the Government of Cuba have no basis in fact.

67) The Brothers to the Rescue aircraft notified air traffic controllers as to their flight plans, which would take them north of the 24th parallel and close to Cuban airspace.

68) International law provides a nation with airspace over the 12-mile territorial sea.

69) The Castro regime's response to that Saturday afternoon's rescue mission flight was to scramble two fighter jets from a Havana airfield.

70) At approximately 3:24 p.m., the pilot of one of the Cuban MiGs received permission and proceeded to shoot down one Brothers to the Rescue airplane more than 6 miles north of the Cuban exclusion zone, or 18 miles from the Cuban coast.

71) Approximately 7 minutes later, the pilot of the Cuban fighter jet received permission and proceeded to shoot down the second Brothers to the Rescue airplane almost 18.5 miles north of the Cuban exclusion zone, or 30.5 miles from the Cuban coast.

*Martinez v. Netflix, et al.*

72) The Cuban dictatorship, if it truly felt threatened by the flight of these unarmed aircraft, could have and should have pursued other peaceful options as required by international law.

73) However, that was not the case because on February 23, MININT officials met with Eugene Carroll, then rear admiral in the United States Navy, and insinuated that Cuba was capable and would  shoot down Brothers to the Rescue planes—a warning Mr. Carroll took as a threat and back to the U.S. government.[6]

74) Further, Castro admitted in a Time Magazine interview with Reginald K. Brack, Jr., the chairman of Time, Inc., that he ordered the downing of the planes and discussed the decision with his brother, Raul Castro.[7]

75) It is clear that Castro and Cuban intelligence had been deliberately planning and premeditating the shoot-down of the planes for quite some time.

76) The response chosen by the Castro regime—the use of lethal force—was completely inappropriate and disproportionate to the situation presented to the Cuban Government, making such actions a blatant and barbaric violation of international law and tantamount to cold-blooded murder.

77) There were no survivors of the attack on these aircraft, and the crew of a third aircraft managed to escape this criminal attack by the Cuban Air Force.

---

[6] The Queen of Cuba, Revisionist History, Malcolm Gladwell (2016) (also available through iTunes).

[7] *Shoot-Down of the Brothers to the Rescue Planes, Hearing on H.R. 1999 Before the Subcomm. on Crime of the Comm. on the Judiciary*, 106th Cong. 63-608 (1999) (statement of George Fowler, General Counsel, Cuban American Nat'l Foundation).

*Martinez v. Netflix, et al.*

78)   The crew members of the annihilated unarmed civilian airplanes—Pablo Morales, Carlos Costa, Mario de la Pena, and Armando Alejandre Jr.—were Miami-based U.S. citizens[8] flying on a voluntary basis with Brothers to the Rescue.

79)   This premeditated act took place after a week-long wave of repression by the Cuban government against Concilio Cubano, a Cuban-based umbrella organization of human rights activists, dissidents, independent economists, and independent journalists, among others.

80)   The wave of repression against Concilio Cubano, whose membership was committed to peaceful democratic change in Cuba, included arrests, strip searches, house arrests, and, in some cases, jail sentences lasting for a year or longer.

e.   INTERNATIONAL CONDEMNATION OF THE 1996 ASSASSINATION

81)   There was an international condemnation of the 1996 criminal intentional downing of the Brothers to the Rescue aircraft.

82)   On February 25, 1996, the Inter-American Commission on Human Rights ("the Commission" or "the Inter-American Commission") issued a report stating the following:

> [The Commission] received several complaints brought against Cuba according to which a MIG-29 military aircraft belonging to the Cuban Air Force ("CAF") downed two unarmed civilian light airplanes belonging to the organization "Brothers to the Rescue." According to the report issued by the International Civil Aviation Organization ("ICAO"), the incidents occurred on February 24, 1996 at 3:21 p.m. and 3:27 p.m., respectively, in international airspace. The air-to-air missiles fired by the MiG-29 destroyed the civilian aircraft, immediately killing Armando Alejandre Jr. (45 years old), Carlos Alberto Costa (29), Mario Manuel de la Pena (24), and Pablo Morales (29). The complaint concludes with the Commission being requested to begin proceedings in accordance with Articles 32 *et seq.* of its Regulations and to declare Cuba responsible for failing to comply with its

---

[8] With the exception of Pablo Morales who became a permanent US resident after being rescued at sea by the Brothers to the Rescue.

*Martinez v. Netflix, et al.*

international obligations contained in the American Declaration of the Rights and Duties of Man ("the Declaration" or "the American Declaration") for violating the right to life and the right to a fair trial as set forth in Articles I and XVIII of said international instrument.

After showing that the first element causing the international responsibility of the Cuban State—the actions that violated the American Declaration of the Rights and Duties of Man—was present in the case at hand, the Commission also believes it has been clearly proven that those illicit actions were attributable to the State, in that the responsible agents were officers of the Cuban Air Force and were thus acting in performance of official functions.  This is confirmed by the eye-witnesses' reports, the International Civil Aviation Organization's investigation, and the transcript of the radio exchanges between the Havana control tower and the aircraft pilots who perpetrated the actions.  Consequently, the events of February 24, 1996 are attributable to the Cuban State.

Cuba is responsible for violating the right to life (Article I of the American Declaration of the Rights and Duties of Man) to the detriment of Carlos Costa, Pablo Morales, Mario de la Pena, and Armando Alejandre, who died as a result of the direct actions of its agents on the afternoon of February 24, 1996 while flying through international airspace.

83)  The United Nations Security Council issued a press release stating that:

… [T]he unlawful downing of two civil aircraft on February 24 by the Cuban Airforce violated the principle that States must refrain from using weapons against airborne civil aircraft, the Security Council this afternoon condemned such use as being incompatible with the rules of customary international law contained in article 3 bis and annexes of the 1994 Chicago Convention on International Civil Aviation and with elementary consideration of humanity.

By the terms of the United States-sponsored resolution 1067 (1996), adopted by a  vote of 13 in favour to none against, with 2 abstentions (China, Russia Federation), the Council called upon Cuba to join other States in complying with their obligations to those provisions.  It urged all States that have not done so to ratify the Protocol adding article 3 bus to the Convention as soon as possible and comply with all of its provisions, pending the Protocol's entry into force.

*Martinez v. Netflix, et al.*

Article 3 bis provides that every State must refrain from the use of weapons against civil aircraft in flight.  In case of interception, the lives of those aboard and the safety of the aircraft must not be endangered.

84)  Then-President Bill Clinton made a public statement condemning the attack.

85)  The Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 was passed.

      f.  <u>THE CUBAN SPIES STAND TRIAL</u>

86)  The Cuban Five (Gerardo Hernández, Antonio Guerrero, Ramón Labañino, Fernando González, and René González) were arrested in September 1998 and ultimately convicted in Miami of conspiracy to commit espionage, conspiracy to commit murder, acting as unregistered agents of a foreign government, and other illegal activities in the United States.

87)  All five were arrested in Miami on September 12, 1998 and were indicted by the U.S. government on 25 counts, including charges of false identification and conspiracy to commit espionage. Seven months later, Gerardo Hernández was indicted for conspiracy to commit murder in connection with the shoot-down of the Brothers to the Rescue aircraft

88)  Because he was called back to Cuba immediately before the downing of the Brothers to the Rescue planes, Roque was not part of the trial.  However, a federal indictment charged Roque in 1999 with failing to register as a foreign agent and conspiring to defraud the United States.

89)  The trial began in November 2000 in the U.S. District Court for the Southern District of Florida and lasted seven months.  At the time, it was the largest and most complex case in the history of the Southern District of Florida.

*Martinez v. Netflix, et al.*

90)   At the close of the evidence and closing arguments, jury deliberations lasted only a few hours.   In June 2001, the jury returned verdicts of guilty on all counts, including the charge of first-degree murder against Hernández for the murder of Pablo Morales, Carlos Costa, Mario de la Pena, and Armando Alejandre Jr., who had been shot down in international waters while flying a humanitarian rescue mission.

91)   In December 2001, the members of the group were sentenced to prison terms: two life terms for Hernández, to be served consecutively; life for Guerrero and Labañino; 19 years for Fernando González; and 15 years for René González.

g.   ANA MARGARITA'S SEXUAL ASSAULT LAWSUIT

92)   On February 22, 1996, Roque told Ms. Martinez that he was leaving on a business trip.   The following evening, he packed and left home at 3:00 in the morning, abandoning Ms. Martinez and her children—they have never seen him again.

93)   Three days later, Roque appeared on CNN being interviewed in Havana, Cuba. The CNN interview was the means by which Ms. Martinez discovered the whereabouts of her missing husband.

94)   Ms. Martinez was an unwilling pawn used by Roque to establish a creditable cover for his covert espionage activities on behalf of the Cuban Government. All along, Ms. Martinez was unaware that the man that she had fallen in love with was acting under orders from Cuba.  Ms. Martinez believed that Roque shared her anti-communist ideals.   She believed that he was a brave man who by joining the pro-democracy organization, Brothers to the Rescue, shared her desire to assuage the treacherous plight of rafters fleeing the Communist island.

*Martinez v. Netflix, et al.*

95)  Roque's marriage to Ms. Martinez had been part of Roque's cover – and a sham, making Ana Margarita and her children a part of the Cuban government's Machiavellian espionage plan.

96)  After discovering that her purported husband had, in fact, been a Cuban spy and that she had unknowingly been subjected to a sham marriage, Ms. Martinez was emotionally destroyed and psychologically devastated.

97)  The callous disregard of Roque for Ms. Martinez was disgustingly evil and absurdly grotesque.  Ms. Martinez had been sexually assaulted by Rogue at the direction of the Cuban government.

98)  Shortly after Roque arrived back in Cuba following his "mission," he was asked on a Cuban television program what he missed most about his life in the United States — his answer was his "Jeep Cherokee."

99)  The level of emotional and psychological distress that was inflicted upon Ms. Martinez is hard to fathom; such distress continues to haunt her to the present date.

100) In 1999, Ms. Martinez filed a personal injury lawsuit against The Republic of Cuba.  The gravamen of the lawsuit was that Roque, acting at the direction of the Cuban government, had raped Ms. Martinez under false pretenses and that, as a result, she had suffered extreme emotional and psychological distress.

101) On March 13, 2001, in the case of *Ana Margarita Martinez v. The Republic of Cuba*, Case No. 1999018208-CA-20, the 11th Judicial Circuit Court in and for Miami-Dade County, Florida issued a final judgment in favor of Ms. Martinez that contains extensive findings of fact.[9]

---

[9] A copy of the findings of fact is attached hereto as Exhibit "A."

*Martinez v. Netflix, et al.*

102) In November 2016, the United States District Court for the Northern District Of New York[10] summarized the findings of the Florida Judgment against the Republic of Cuba as follows:

> In February 1992, Juan Pablo Roque, a Cuban spy, swam to the Guantanamo Bay Naval Base on the pretense that he was a "military defector from Cuba." Fla. J. at 3. Roque's mission was to infiltrate the Cuban expatriate community in Miami and conduct espionage on behalf of the Cuban government. *Id.* at 1–2. Accordingly, when he arrived in Miami in March 1992, he began integrating himself into the Cuban exile community. *Id.* at 3. He started going to a church attended by Martinez, who "saw him regularly at religious services and church events." *Id.* After formally meeting at a church-related event in May 1992, the two started dating. *Id.* Cuba ordered Roque to romantically pursue Martinez, whom he married after three years of dating. *Id.* Unbeknownst to Martinez, "Roque was using her as an unwitting pawn to legitimize his presence in Miami by establishing a credible cover for his covert espionage activities on behalf of the Cuban Government." *Id.* Roque performed espionage as part of a spy ring known as the "Wasp Network," which took orders from Cuba. *Id.* at 4. Roque used the cover provided by his marriage to "infiltrate[] Miami-based organizations that have humanitarian missions directed toward Cuba or desire democracy for Cuba." *Id.* at 3. At the same time, he became an established member of the Cuban exile community in Miami. *Id.*
>
> On February 23, 1996, Roque left home and went to Havana, Cuba. *Id.* at 4. He had told Martinez that he was going on a business trip, but she realized what actually happened when, two days later, Roque gave an interview to CNN in which he said he had returned to Cuba because he was "disillusioned with life in the United States." *Id.* Although it is not clear from the Florida Judgment, it appears that he also revealed that he had been performing espionage on behalf of the Cuban government. *Id.* Stunned by the news that her husband was a Cuban spy, Martinez became "emotionally distraught." *Id.* at 5. Her distress was compounded by the exile community's suspicion that she was "conspiring" with her husband. *Id.* She had her marriage annulled on October 15, 1996, on account of Roque's fraud. *Id.* Finally, "[s]he required medical and psychological care

---

[10] *Ana Margarita Martinez v. The Republic of Cuba*, 1:14-CV-00856 (N.D. New York 2016) at [ECF 059].

*Martinez v. Netflix, et al.*

and was left saddled with debt . . . incurred by Roque while he was married to her." *Id.* at 6

***

Cuba was served with process in the Florida state proceedings but failed to appear, "assert[ing] in a diplomatic note that the Courts in the United States have no jurisdiction over Cuba." *Id.* at 8. On March 9, 2001, following the entry of default and a non-jury trial, the Florida state court found that Cuba was liable under 28 U.S.C. §§ 1605(a)(7)2 and 1605(a)(5) for acts of torture and battery suffered by Martinez at the hands of Roque. *Id.* at 8–11. These findings formed the basis of the court's conclusion that it had subject matter jurisdiction over Martinez's case.   The court awarded Martinez $7,175,000 in compensatory damages, noting that it was "outraged by the defendant Cuba's conduct and would have awarded 20 million in punitive damages if it could." *Id.* at 22.

103) Ms. Martinez has been unable to satisfy her judgment against the Republic of Cuba.

104) Although she was vindicated at trial, the wounds left by the emotional, psychological, and physical harm she suffered remain.  Defendants' false and defamatory portrayal of Ms. Martinez in *The Wasp Network* has reopened such wounds; causing her extreme psychological and emotional distress.

105) By presenting Ms. Martinez in a false and misleading light, while presenting Roque in a favorable light, Defendants have intentionally caused extreme emotional distress in the pursuit of profits.

106) Defendants intentionally caused such distress with complete disregard for the trauma that it would inflict upon Ms. Martinez.

## II.   *THE WASP NETWORK* FILM: THE FALSE AND DEFAMATORY PORTRAYAL OF MS. MARTINEZ

107) In the Film, which is presented as being "based on a true story," Assayas delivers a deceptive narrative that attempts to justify the crimes committed by the

"Cuban Five," by describing them as courageous heroes who were defending their homeland, and further vilifies and disparages the Cuban exiles, including Ms. Martinez, as being a community comprised of terrorists and drug traffickers. *See* Scene 1 (00:01:30); *see also infra* at Section III.[11]

108) This portrayal of the Cuban exile organizations in the 1990's is inaccurate. Namely, there is no connection whatsoever among the Cuban American National Foundation (CANF) or Brothers to the Rescue organization to any terrorist attacks against Cuba or drug trafficking activity. The Film also fails to show why certain members of the Cuban diaspora chose to establish such civic-society groups abroad, *i.e.*, the Film ignores the fact that thousands of Cubans were robbed, imprisoned, beaten, and executed without trial under Castro's dictatorship. Yet, despite the foregoing inhumane and unlawful conduct, Assayas shows no qualms in allowing his characters in the Film to refer to legitimate political dissidents with the official label of "worm" in Spanish (which translates to "traitor").

109) This portrayal of the Cuban exile community was deliberately calculated to create one, clear, and unmistakable villain to be targeted for criminal and terrorist activities against Cuba.

110) By doing so, the Film downplays the level and reach of the Wasp Network's espionage, by attempting to rewrite history in a dishonest and irresponsible way, romanticizing, sympathizing, and showing favoritism of the Cuban regime over the Cuban diaspora and exiled Cuban community.

---

[11] Portions of the Film are identified herein using the "Scene" number from the Film's script and/or by a timecode that shows the approximate hours, minutes, and seconds (hh:mm:ss) of the relevant portion of the Film.

*Martinez v. Netflix, et al.*

111)   It is against this backdrop, where Cuban exiles are being portrayed in a false and negative light, that the Film venerates the espionage work of the "Cuban Five".

112) While maligning the Cuban exile community, in general, the Film also exposes Ms. Martinez in a false and defamatory manner in nearly every scene of the Film in which she appears.   The Film's portrayal of her cannot be justified as the mere use of artistic license or dramatization.

113) In the Film, which Defendants have marketed and promoted as "based on true events", Defendants depict Ms. Martinez, using her true name, as a sexually promiscuous immoral woman, who is involved with drug trafficking and terrorist activities.   The Film falsely imputes on Ms. Martinez sexually immoral or unchaste conduct and falsely imputing a "party girl" lifestyle, the Defendants strongly reinforced this false narrative by casting Ana De Armas to play Ms. Martinez (Ana De Armas is known for playing roles where she is nude and in sex scenes).   *See infra.*

114) Specific examples of the false and slanderous scenes that appear throughout the Film, include:

   a)   The Film falsely portrays Ms. Martinez as being highly flirtatious with Roque when they first met at a small church (contrary to the film, she did not tell him he looked like a sexy movie star). *Scene 35* (00:21:40).

   b)   The immediately following scene Roque and Ms. Martinez pulling up in front of Ms. Martinez's home and then engage in a sexualized encounter supposedly with Ms. Martinez' ex-husband nearby in Ms. Martinez' home.  *Scene 36* (00:22:20-00:23:30).   This entire scene is completely fraudulent and presents Ms. Martinez in a scandalous and defamatory light. In reality, Ms. Martinez did

*Martinez v. Netflix, et al.*

not go on a date with Roque until a long time after they first met at the small church; Roque did not have a car; they did not kiss; and Ms. Martinez's ex-husband was not still living in her home when she dated Roque or at any point in time after her divorce.



c)      The following scenes of the Film show Roque and Rene's purported involvement in purported "terrorist" activity and drug trafficking as members of Brothers to the Rescue (*Scenes 38—40, 46—48)* (00:25:13-00:32:17). The Film cuts to a scene of Ms. Martinez at her home.   *Scene* 49 (00:32:18-00:34:00). Roque is now shown to be living at Ana Margarita's home, and ,when Rene arrives.   *Id*. This home is much more luxurious than the modest home that Ms. Martinez actually lived in with her two young children.   *Id*.   Ms. Martinez's lifestyle portrayed in this scene does not reflect the reality in which she worked a 9-to-5 job to make ends meet (Roque was often unemployed). Ms. Martinez was a devoted mother to her children; cooking meals every night.   Ms. Martinez' two young children do not appear at all in the Film, which gives the false impression that she was an absentee or delinquent mother.   *Id*.   This is one of the first of many scenes to follow that are fabricated to fit the Film's false narrative that Ms. Martinez was enjoying a lush and comfortable lifestyle derived from ties to illegal activity being conducted by Roque and the so-called Cuban mafia.

*Martinez v. Netflix, et al.*

d)      Scene 59 falsely portrays Ms. Martinez as having a relationship with the "Cuban mafia" and falsely portrays her as seeking to solidify ties to the "Cuban mafia."  *See* Scene 59 (00:37:20-00:38:00).  The Film falsely shows Ms. Martinez as being very excited to have Jorge "Mas Canosa, the supposed "godfather" of the "Cuban mafia" attend her upcoming wedding.  *Id*.

e)      Scene 59 also portrays Ms. Martinez as excitedly planning the "wedding of the decade" at the Alexander Mansion; with members of the Cuban mafia in attendance.  *See* Scene 59 (00:37:20-00:38:00).  This portion of the film is entirely false and defamatory as it falsely portrays Ms. Martinez as being actively and excitedly involved with the mafia.  *Id*.

f)      When Ms. Martinez's character in the Film believes her fiancé (Roque) is involved in drug trafficking, her character is shown to do nothing other than to lightly complain – and Ms. Martinez therefore falsely depicted as being a willing to accept, to enjoy, and to help conceal, that the falsely depicted lavish lifestyle was as a result of felony drug trafficking by Roque. *See Scene* 59 (00:38:04-00:41:00).  Ms. Martinez is portrayed as believing that Roque is a hardened criminal, but still willing to continue with marriage.  *Id*.  In reality, at no point in time did Ms. Martinez ever suspect that Roque was ever involved in any criminal activities.  The Film is therefore highly defamatory as to Ms. Martinez' character as a woman and mother of two young children.

g)      The defamatory portrayal of Ms. Martinez false acceptance of Roque being involved in drug trafficking, and the defamatory portrayal of Ms. Martinez having connections with the "Cuban mafia," are further exaggerated by this scene

*Martinez v. Netflix, et al.*

(Scene 59) appearing directly after a scene falsely portraying the "Cuban mafia" being involved in drug trafficking. *See* Scenes 52-55 (00:34:00-00:40:00).

h)    Having falsely defamed Ms. Martinez as willingly accepting that Roque was a criminal drug trafficker, the Film show Ms. Martinez as happily and excitedly proceeding to marry Roque. *See* (00:44:00-.00:48:20) (defaming Ms. Martinez by giving the false impression that Ms. Martinez willingly entered into a marriage with a cold-blooded criminal. *Id.*

i)    In Scene 65 of the Film, Ms. Martinez and Roque's Wedding, the Film shows an extravagant Rolls Royce arriving; a large cheering crowd outside the church; many rich "bigwigs" wearing flashy signet rings, guayaberas, sunglasses and smoking cigars; and a lavish press presence. *See Scene* 65 (00:44:00-.00:48:20). All of the foregoing elements of the Film are entirely false and present a defamatory image of Ms. Martinez living a mafioso-like lifestyle paid for by cocaine and terrorist activities. *Id.*

j)    Scenes 69—72; Martinez and Roque's Wedding Reception at the Alexander Mansion: The Film falsely portrays Ms. Martinez as having an extravagant "Godfather style" wedding reception with leaders of the Cuban-American exile community present, which never actually occurred. *See* (00:45:42-00:48:35). The real wedding reception was not held at "the Alexander Mansion," nor was it held at any mansion. In reality, and contrary to the Film, there was no paparazzi waiting at the entrance of the wedding reception; there was no orchestra playing; and Jorge Mas Canosa, the so-called "President" of the Cuban mafia, was not in attendance. *Id.* This portion of the Film was entirely fraudulent and

*Martinez v. Netflix, et al.*

defamatory because it falsely shows Ms. Martinez as happily and willingly aligning herself with drug trafficking, organized crime, and even terrorism.





k)   Scene 73; Afterparty at Club Alcazaba – There actually was a wedding after-party at Club Acazaba, but Ms. Martinez is falsely defamed in the Film as an over-sexualized and reckless woman. *See* (00:48:40-00:50:22). The Film falsely portrays her as provocatively dancing with an unidentified man on her wedding night, while she surreptitiously signals her friend to stay quiet about the interlude. *Id*. None of this actually occurred and the Film is defamatory to Ms. Martinez.

*Martinez v. Netflix, et al.*





l)      The Film falsely portrays her as being drunk after her wedding and Roque having to carry her to their Presidential suite; none of which actually occurred.  *See* (00:50:00-00:50:22).



m)      The Film falsely erases the existence of Ms. Martinez being a working mother, with two young children, in order to objectify and sexualize her character in a false manner.  For those people who saw the Film that actually

*Martinez v. Netflix, et al.*

know Ms. Martinez as having two young children at the time of these purported events, the Film falsely portrays Ms. Martinez as an irresponsible mother who knowingly endangering her young children.

n)   In addition to the overtly false portrayal of Ms. Martinez's association with drug trafficking, the Defendants strongly reinforced this false narrative by casting Wagner Moura to play Roque (before Wasp Network, Wagner Moura was primarily known for his starting role in the Netflix series "Narcos," where he played the character Pablo Escobar from 2015-2018).

o)   The Film conceals the fact that Ms. Martinez was a victim of sexual assault conceived and implemented with cold-blooded efficiency by an agent of Cuba's Ministry of the Interior.

p)   The Film falsely imputes Ms. Martinez as having been knowingly associated with criminal enterprises that were purportedly engaging in terrorism and drug trafficking.

115) There is no basis in fact to impute on Ms. Martinez such sexually immoral or unchaste conduct that is depicted in the Film.

116) There is also no basis in fact to affiliate Ms. Martinez with any terrorist activities or involvement in drug trafficking.

117) There is no basis in fact to impute on Ms. Martinez as living a lavish lifestyle or as having been associated with any criminal enterprises.

118) The "information" that was used to develop Ms. Martinez's character in the Film was fabricated.  Based on the sheer volume of facts available in the public record which directly contradict the portrayal of Ms. Martinez in the Film, Defendants'

*Martinez v. Netflix, et al.*

marketing and promotion of the Film as a truthful account of what transpired between the Cuban spies and the Cuban exiles is unconscionable, defamatory and actionable.

119) Notably, the Defendants completely disregarded the undisputable factual record established in various judicial and legislative proceedings, including without limitation: *Martinez v. Republic of Cuba*, Eleventh Judicial Circuit Court in and for Miami-Dade County, Case No. 99-18208-CA-20; US Congressional findings encoded at 22 U.S. Code § 6046, titled "Condemnation of Cuban attach on American aircraft"; and *United States v. Hernandez, et al.*, 124 F.Supp.2d 698 (S.D. Fla. 2000).

120) Defendants have expressly sought to mislead its viewers to believe that the Film's portrayal of Ms. Martinez, as a member of the Cuban exile community, is accurate in form or substance, when in fact, the Defendants' portrayal of Ms. Martinez and the exile community that she was part of, was fabricated and false.

121) When marketing and promoting the Film as being based on "true" events, Defendants knew that the portrayal of Ms. Martinez was false and defamatory.

122) As a result of the publication of the Film, which continues to stream on Netflix's platform, Defendants have defamed Ms. Martinez and have caused her severe emotional distress.

### III.   DEFENDANTS' ASSERTIONS THAT *THE WASP NETWORK* IS A TRUE STORY

123) Netflix continuously advertises *The Wasp Network* as "Based on a true and gripping story" within the film's main description.

124) The phrase "Based on a True Story" is boldly displayed within the Film's official movie trailer.

*Martinez v. Netflix, et al.*

125) In the very first scene of the movie, seconds after the first character appears on screen, *The Wasp Network* displays, in large font, the phrase "**this is based on a true story**."



126) Defendants could have perhaps reduced the extent of their defamatory depictions of Ms. Martinez by including a clearly visible disclaimer stating that the events and characters portrayed in *The Wasp Network* had been altered for dramatic effect or some other disclosure to the effect.  On the contrary, it is apparent that the Defendants actively wanted viewers to believe that the film was factually accurate and authentic in every respect.

127) This has clearly had the intended impact on viewers and critics.  Specifically, numerous publications and viewer reviews have specifically noted that the film is a "true story."  As a result, the viewing public has indeed been fooled into believing that *The Wasp Network* is a true account of real events that accurately depicts the characters therein.

## IV.   DEFENDANTS ARE PLACED ON NOTICE REGARDING DEFAMATION

128) The Assembly of the Cuban Resistance has urged Netflix to correct the untruthful and defamatory portrayals of the Cuban exiles in *The Wasp Network* that

*Martinez v. Netflix, et al.*

were untruthfully touted as being "Based on True Events."  Correspondence dated July 30, 2020, addressed to Netflix's Chief Executive Officer, Wilmot Reed Hastings, informed Netflix that *The Wasp Network* is promoting the Castro regime's untruthful propaganda. The correspondence further informed Netflix that the film depicts "internationally recognized actors uttering the mantras (of communist propaganda); the embargo (not the regime) blamed for Cuba's condition, downplaying the level and reach of the Cuban government's espionage and murder conspiracy, the blanket labeling and portrayal of Cuban exiles as terrorists; attempted justification for crimes proven in a court of law and total disregard for the real victims." The correspondence lamented that *The Wasp Network* is straight out of the Cuban regime's playbook and it is 'now playing' under the false and slanderous pretense of being "Based on True Events." Netflix did not respond to this letter.

129) On August 12, 2020, Ms. Martinez, by and through her counsel, delivered a Pre-Suit Notice Letter to Defendant, pursuant to Sections 770.01 and 770.02, Florida Statutes,[12] specifying Ms. Martinez's harm caused by Defendant's conduct, and providing written demands to remedy Defendant's actions.[13]

130) In this letter, Ms. Martinez demanded that Netflix issue a "full and fair correction, apology, or retraction," outlined in the following terms: (i) Netflix must issue a public statement correcting the false and defamatory scenes concerning Ms. Martinez that appear in *The Wasp Network* as detailed herein above, (ii) Netflix must place a prominent and clearly visible disclaimer at the beginning of the film, which states that

---

[12] It is debatable whether Netflix is entitled to pre-suit notice under the Florida Statutes, and Ms. Martinez expressly reserved and continues to reserve all legal rights in this regard.

[13] The letter is attached hereto as Exhibit "B."

the film is a dramatization, is not a true story, and that the characters identified by their actual names in the film are not truthfully or accurately depicted therein, (iii) Netflix must categorize *The Wasp Network* as a fictional drama on all streaming services and marketing campaigns, and (iv) Netflix must remove all posts on its social media and any other print references which refer to *The Wasp Network* as a true, real, or fact-based story.

131) To the date of this Complaint, Netflix has failed to make any such retractions, apologies, or otherwise comply with Ms. Martinez's demands.

## CONDITIONS PRECEDENT

132) All conditions precedent to the institution of this action have been waived, performed, or have occurred.

## ATTORNEYS' FEES AND COSTS

133) Plaintiff has retained the undersigned counsel to represent her in this action and is obligated to pay counsel a reasonable fee for their services.  Plaintiff seeks to recover her reasonable attorney's fees and costs from Defendants pursuant to applicable law.

## CAUSES OF ACTION

### COUNT I - DEFAMATION *PER SE* (NEGLIGENCE)

134) Plaintiff incorporates by reference, re-alleges, and adopts paragraphs 1 through 132 of this Complaint as though fully stated herein.

135) This cause of action is for negligent defamation *per se* against the Defendants.

136) Defendants' publications of the false, defamatory statements are defamatory *per se* because they portray a want of integrity in Ms. Martinez's personal life, particularly their depiction of Ms. Martinez's ties to "terrorist cells" and purported drug

*Martinez v. Netflix, et al.*

traffickers, and also prejudice Ms. Martinez professionally due to the degradation of her name throughout the Film.

137) The falsehoods portrayed in *The Wasp Network* tend to degrade Ms. Martinez, bring Ms. Martinez into ill repute, and destroy confidence in Ms. Martinez's integrity. Such falsehoods suggests that Ms. Martinez has committed dishonest and illegal actions.

138) *The Wasp Network* therefore harms the reputation of Ms. Martinez, as to lower her in the estimation of the community, or to deter third persons from associating or dealing with Ms. Martinez.

139) Defendants have acted, at a minimum, negligently as to the falsity in publishing the false and defamatory material in *The Wasp Network*.

140) Defendants' conduct caused Ms. Martinez actual damages.

141) Netflix is a major corporation and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

**WHEREFORE**, Ms. Martinez prays for judgment against Defendants and an award of:

1. Actual damages in an amount to be determined at trial;

2. Punitive damages;

3. The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

*Martinez v. Netflix, et al.*

    4.  For such other and further relief as the Court deems just and equitable.

### COUNT II - DEFAMATION *PER SE* (KNOWING OR RECKLESS DISREGARD)

142) Plaintiff incorporates by reference, re-alleges, and adopts paragraphs 1 through 132 of this Complaint as though fully stated herein.

143) In the alternative to Count I, which alleges <u>negligent</u> defamation *per se*, Ms. Martinez brings this cause of action against Defendants for <u>knowing or reckless</u> defamation *per se* and alleges that Defendants acted with knowing or reckless disregard as to the truth in publishing the false and defamatory material in *The Wasp Network*.

144) Defendants' publications of the false, defamatory statements are defamatory *per se* because they impute a want of integrity in Ms. Martinez's personal life, particularly their depiction of Ms. Martinez's ties to "terrorist cells" and purported drug traffickers, and also prejudice Ms. Martinez professionally due to the degradation of her name throughout the Film.

145) The falsehoods portrayed in *The Wasp Network* tend to degrade Ms. Martinez, bring Ms. Martinez into ill repute, and destroy confidence in Ms. Martinez's integrity. Such falsehoods suggests that Ms. Martinez has committed dishonest and illegal actions.

146) *The Wasp Network* therefore harms the reputation of Ms. Martinez, as to lower her in the estimation of the community, or to deter third persons from associating or dealing with Ms. Martinez.

147) Defendants' conduct caused Ms. Martinez actual damages.

148) Netflix is a major corporation and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

**WHEREFORE**, Ms. Martinez prays for judgment against Defendants and an award of:

1.  Actual damages in an amount to be determined at trial;

2.  Punitive damages;

3.  The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

4.  For such other and further relief as the Court deems just and equitable.

### COUNT III - DEFAMATION *PER QUOD* (NEGLIGENCE)

149) Plaintiff incorporates by reference, re-alleges, and adopts paragraphs 1 through 132 of this Complaint as though fully stated herein.

150) This cause of action is brought against the Defendants for Negligent Defamation *Per Quod*.

151) Defendants' publications of the false, defamatory statements are defamatory *per quod* because they portray or imply a want of integrity in Ms. Martinez's personal life, particularly their depiction of Ms. Martinez's ties to "terrorist cells" and purported drug traffickers, and also prejudice Ms. Martinez professionally due to the degradation of her name throughout the Film.

152) The falsehoods portrayed or implied in *The Wasp Network* tend to degrade Ms. Martinez, bring Ms. Martinez into ill repute, and destroy confidence in Ms. Martinez's integrity.   Such falsehoods suggest and impute that Ms. Martinez has committed dishonest and illegal actions.

*Martinez v. Netflix, et al.*

153) *The Wasp Network* therefore harms the reputation of Ms. Martinez, as to lower her in the estimation of the community, or to deter third persons from associating or dealing with Ms. Martinez.

154) Defendants have acted, at a minimum, negligently as to the falsity in publishing the false and defamatory material in *The Wasp Network*.

155) Defendants' conduct caused Ms. Martinez actual damages and/or special damages.

156) Netflix is a major corporation and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

**WHEREFORE**, Ms. Martinez prays for judgment against Defendants and an award of:

1. Actual damages in an amount to be determined at trial;

2. Punitive damages;

3. The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

4. For such other and further relief as the Court deems just and equitable.

**COUNT IV - DEFAMATION *PER QUOD* (KNOWING OR RECKLESS DISREGARD)**

157) Plaintiff incorporates by reference, re-alleges, and adopts paragraphs 1 through 132 of this Complaint as though fully stated herein.

*Martinez v. Netflix, et al.*

158) In the alternative to Count III, which alleges <u>negligent</u> defamation *per quod*, Ms. Martinez brings this cause of action against Defendants for <u>knowing or reckless</u> defamation *per quod* and alleges that Defendants acted with knowing or reckless disregard as to the truth in publishing the false and defamatory material in *The Wasp Network*.

159) Defendants' publications of the false, defamatory statements are defamatory *per quod* because they portray or imply a want of integrity in Ms. Martinez's personal life, particularly their depiction of Ms. Martinez's ties to "terrorist cells" and purported drug traffickers, and also prejudice Ms. Martinez professionally due to the degradation of her name throughout the Film.

160) The falsehoods portrayed or implied in *The Wasp Network* tend to degrade Ms. Martinez, bring Ms. Martinez into ill repute, and destroy confidence in Ms. Martinez's integrity.  Such falsehoods suggest and impute that Ms. Martinez has committed dishonest and illegal actions.

161) *The Wasp Network* therefore harms the reputation of Ms. Martinez, as to lower her in the estimation of the community, or to deter third persons from associating or dealing with Ms. Martinez.

162) Defendants have acted, at a minimum, negligently as to the falsity in publishing the false and defamatory material in *The Wasp Network*.

163) Defendants' conduct caused Ms. Martinez actual damages and/or special damages.

164) Netflix is a major corporation and punitive damages are warranted in an amount sufficient to punish it and to deter it and others from such wrongful conduct.

*Martinez v. Netflix, et al.*

**WHEREFORE**, Ms. Martinez prays for judgment against Defendants and an award of:

      1.  Actual damages in an amount to be determined at trial;

      2.  Punitive damages;

      3.  The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

      4.  For such other and further relief as the Court deems just and equitable.

### COUNT V - CONSPIRACY TO DEFAME

165) Plaintiff incorporates by reference, re-alleges, and adopts paragraphs 1 through 132 of this Complaint as though fully stated herein.

166) This is an action against Defendants for Conspiracy to Defame Ms. Martinez.

167) Defendants conspired together to publish *The Wasp Network* which portrays Ms. Martinez in a false and defamatory manner.

168) Defendants further conspired and agreed to purposefully market and aggressively promote *The Wasp Network* as a "true" story, despite it containing so many fabrications and falsehoods about Ms. Martinez.

169) Each of the Defendants committed overt acts in furtherance of the conspiracy.

170) As a result of the conspiracy, Ms. Martinez has suffered, and continues to suffer, actual damages in an amount to be determined at trial, but in excess of $75,000,

*Martinez v. Netflix, et al.*

including economic losses, lost career opportunities, reputational harm, and emotional distress.

171) These damages were proximately caused by Defendants' conspiracy to defame Ms. Martinez.

**WHEREFORE**, Ms. Martinez prays for judgment against Defendants and an award of:

    1. Actual damages in an amount to be determined at trial;

    2. Punitive damages;

    3. The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

    4. For such other and further relief as the Court deems just and equitable.

### COUNT VI - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

172) Plaintiff incorporates by reference, re-alleges, and adopts paragraphs 1 through 132 of this Complaint as though fully stated herein.

173) This is an action against Defendants for Intentional Infliction of Emotional Distress.

174) Defendants intentionally or recklessly inflicted emotional distress upon Ms. Martinez when they knew or should have known that emotional distress would result.

*Martinez v. Netflix, et al.*

175) This is particularly true because Defendants were well aware that Ms. Martinez had already endured extreme psychological and emotional distress as a result of the sexual assault she endured from Roque at the direction of the Cuban government.

176) Because the Film portrays Roque and the other Cuban spies in a falsely favorable light (i.e. falsely showing him as a heroic defender of the Cuban people against purported terrorists), as opposed to the realty of Roque being a Machiavellian agent of the Castro regime that had manipulated and sexually assaulted Ms. Martinez.

177) The false and defamatory contents of *The Wasp Network* are outrageous and beyond all bounds of decency.

178) Ms. Martinez has suffered, and continues to suffer, sever emotional distress.

179) There exists a causal connection between the aforementioned conduct and the injury and damages suffered by Ms. Martinez.

**WHEREFORE**, Ms. Martinez prays for judgment against Defendants and an award of:

1.  Actual damages in an amount to be determined at trial;

2.  Punitive damages;

3.  The entry of a permanent injunction prohibiting Netflix from making *The Wasp Network* in its current form available for streaming or in any other method of transmission or format; alternatively, the entry of a permanent mandatory injunction requiring Netflix to edit so as to delete the defamatory and false references to the Film being "Based on True Events" from any version made available for streaming or in any other method of transmission or format; and

4.  For such other and further relief as the Court deems just and equitable.

*Martinez v. Netflix, et al.*

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter a judgment in her favor and against Defendants NETFLIX, INC., ORANGE STUDIOS, S.A., and OLIVIER ASSAYAS for:

A) all recoverable compensatory, statutory, and other damages sustained by Plaintiff;

B) both pre-judgment and post-judgment interest on any amounts awarded;

C) attorneys' fees, costs, and expenses;

D) treble and/or punitive damages as may be allowable under applicable law;

E) equitable relief; and

F) such other relief as the Court may deem be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable, and a trial pursuant to Rule 39(c), Federal Rules of Civil Procedure, as to all matters not triable as of right by a jury to the extent permitted by law.

*Martinez v. Netflix, et al.*

Dated:  March 2, 2022
Miami, FL

*Respectfully submitted,*

**HIRZEL DREYFUSS & DEMPSEY, PLLC**
*Counsel for Plaintiff*
2333 Brickell Avenue, Suite A-1
Miami, Florida 33129
Telephone: (305) 615-1617
Facsimile:  (305) 615-1585

By*: /s/ Leon F. Hirzel*
      **LEON F. HIRZEL**
      Florida Bar No.: 085966
      Email: hirzel@hddlawfirm.com
      **PATRICK G. DEMPSEY**
      Florida Bar No.: 27676
      Email: dempsey@hddlawfirm.com
      **PEDRO V. ROIG**
      Florida Bar No. 918350
      Email: roig@rvlawgroup.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 2, 2022, the foregoing was electronically filed and served via the CM/ECF e-filing portal, which will serve copies via electronic mail to all counsel of record.

*/s/ Leon F. Hirzel*
LEON F. HIRZEL