**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO: 1:20-cv-24328-MGC**

ANA MARGARITA MARTINEZ,

     Plaintiff,

v.

NETFLIX, INC.,
ORANGE STUDIOS, S.A., and
OLIVIER ASSAYAS

     Defendants.

_____/

**DEFENDANTS NETFLIX, INC.'S AND ORANGE STUDIO, S.A.'S**
**MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendants Netflix, Inc. ("Netflix") and Orange Studio, S.A. ("Orange," and together with Netflix, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Complaint of plaintiff Ana Margarita Martinez ("Martinez" or "Plaintiff") pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").

## PRELIMINARY STATEMENT

The Court previously dismissed Plaintiff's Complaint, finding that her claims were "unsupported" by the actual content of the film "Wasp Network" (the "Film"). After months of intense and costly discovery, Plaintiff now files a First Amended Complaint (D.E. 97) (the "FAC"), in which she again attempts – equally unconvincingly – to manufacture defamation and intentional infliction of emotional distress claims out of a sympathetic portrayal of the Ana Margarita Martinez character in the Film. As with her first attempt, nothing her FAC alleges is actionable, and the Court should dismiss it, this time with prejudice.

The Film is a docudrama based on the story of a Cuban spy ring that infiltrated Florida's Cuban exile community in the 1990s. Plaintiff is a well-known member of the Cuban exile community who married one of those spies, Juan Pablo Roque ("Roque"), having no knowledge about his covert activities until after he abandoned her to return to Cuba. Plaintiff disapproves of the Film because, to her, it is not sufficiently anti-Castro. But Plaintiff undeniably figures in the events portrayed in the Film. She may not like how she, Roque, and the Cuban exile community more generally are portrayed. But nothing in the Film defames her. It is a fundamental tenet of defamation law that the First Amendment bars plaintiffs from bringing claims based on their dislike of protected speech, yet that is precisely what Plaintiff has done here. Plaintiff cannot subjectively veto the filmmakers' First Amendment right to tell the story through a manufactured "defamation" action.

After viewing the Film, the Court dismissed the original Complaint for failure to plead defamation. (Order on Motions to Dismiss, D.E. 95 ("Order"), at 11.) The Court conducted a detailed analysis of the scenes of the Film in which the character representing Plaintiff appears. And the Court noted that the crux of Plaintiff's defamation claims – that she is portrayed as an "irresponsible mother" who "knowingly associated with criminal enterprises" – is "unsupported by the contents of the [F]ilm." (*Id.* at 12 n.4.) The vast majority of the FAC remains unchanged. Plaintiff added a single substantive paragraph identifying scenes

that purportedly support her defamation claims – but these are the same scenes the Court's Order already analyzed. Thus, the Court has already found Plaintiff's claims to be without merit. Despite dragging Netflix and Orange through nearly a year of discovery, Plaintiff has learned nothing that could substantiate her manufactured claims of defamation, which are so at odds with the Film's content that they make one wonder whether she has actually watched the Film. The FAC should now be dismissed with prejudice. The Film's content remains the same, and no amount of additional discovery can change that.

Plaintiff's intentional infliction of emotional distress ("IIED") claim fares no better. As the Court noted, "[b]ased on the contents of the Film, it appears unlikely to the Court that even if amended, [Plaintiff] could state a claim for IIED under Florida law" as it requires a "difficult showing of outrageous conduct by the defendant." (Order at 13 (citing controlling Eleventh Circuit law).) The Film presents a sympathetic portrait of Plaintiff as a woman who was unknowingly used by a Cuban spy as part of his cover; indeed, large portions of the Film align precisely with Plaintiff's account of events in the FAC. Yet Plaintiff ignored the Court and repleaded her IIED claim, unchanged from the original Complaint. Plaintiff cannot make any showing of "outrageous conduct," so this claim, too, should be dismissed with prejudice.

## BACKGROUND FACTS[1]

Following the Cuban Revolution, Florida, especially Miami, became home to a number of anti-Castro organizations. (*See id.* at ¶¶ 48-53.) In the early 1990s, the Cuban government planted undercover agents, who claimed to be defectors, into the Cuban exile community in order to gain intelligence about these anti-Castro organizations. Among them was Juan Pablo Roque ("Roque"), a former major in the Cuban Air Force. (*Id.* at ¶¶ 57-59.)

Roque met Plaintiff, an exile who had fled Cuba as a child, at a church event in May 1992, and they began dating shortly thereafter. (*Id.* at ¶ 59.) Roque proposed to Plaintiff within six months, but she, having been married twice before, was "cautious," so they didn't marry for three years. (*Id.* at ¶¶ 54, 59-60.) Posing "as a presumed anti-Communist member

---

[1] These facts are drawn from the FAC. For the purposes of this Motion, the facts are limited to those involving Plaintiff and Juan Pablo Roque. For a full recitation of the historical facts set forth in the FAC, see Defendants' Motion to Dismiss the original Complaint (D.E. 18 at 2-4).

of the Cuban exile community in Miami," Roque "infiltrated" anti-Castro organizations in Miami. He joined Brothers to the Rescue ("Brothers"), which aided Cuban refugees (*id.* at ¶¶ 48-53), and affiliated with the Cuban American National Foundation ("CANF"). (*Id.* at ¶¶ 61-63.) On February 22, 1996, Roque told Plaintiff he had to leave at 3 a.m. for a business trip. Three days later, Plaintiff discovered from a tv interview Roque gave in Havana that he had returned to Cuba. (*Id.* at ¶¶ 92-93.)

The day after Roque left Miami, the Cuban Air Force shot down two of three unarmed Brothers planes, killing four Brothers members. (*Id.* at ¶¶ 64-77.) The attack on the Brothers' planes was internationally condemned. (*Id.* at ¶¶ 81-84.) In 1999, Roque was indicted for failing to register as a foreign agent and conspiring to defraud the United States. (*Id.* at ¶ 88.)

Plaintiff concluded her marriage had been "a sham" and she had been used as "an unwilling pawn by Roque to establish a creditable cover for his covert activities on behalf of the Cuban Government." (*Id.* at ¶¶ 94-95.) Plaintiff sued the Cuban government in 1999, ultimately winning a substantial judgment in a Florida court in 2001. (*Id.* at ¶¶ 100-101.)

### WASP NETWORK[2]

The Film opens in the fall of 1990.[3] It portrays Roque, a former Cuban fighter pilot, swimming to Guantanamo to defect. He is soon in Miami, in his cousin's apartment. (Film at 00:16:20-00:20:20; *see* FAC ¶¶ 56-58.) The cousin acts as an FBI informant, and suggests that Roque do the same, telling Roque that the FBI pays "big money." (Film at 00:20:20-00:21:04.) The cousin also introduces Roque to Ana Margarita Martinez ("Ana")[4] at church. (*Id.* at 00:21:24-00:22:10; *see* FAC ¶ 59.) Shortly thereafter, Roque and Ana go on a date, at the end of which she resists his advances beyond a goodnight kiss. (Film at 00:22:10-00:23:25.)

---

[2] These facts are drawn from the Film. As the Court noted in its Order, it is appropriate for it to review the Film in adjudicating Defendants' Motion to Dismiss, as the Film is referred to in the FAC, central to Plaintiff's claim, and of undisputed authenticity. (Order at 1, FN1 (citing *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018).) In accordance with the Court's practice in reviewing the Film, *id.*, the time stamps referenced are drawn from the version of the Film available on Netflix's streaming platform. A copy of the Film has been submitted for the Court's convenience as a DVD along with this Motion.

[3] A more complete version of the facts is contained in the Motion to Dismiss the Complaint (D.E. 18). The factual recitation in this Motion focuses exclusively on the scenes portraying Plaintiff and Roque, as the Court did in its Order.

[4] Defendants refer to the character in the Film as "Ana" to distinguish the character from Plaintiff.

Both Roque and another of the Cuban spies, Rene Gonzalez ("Rene")[5], are recruited to join Brothers, helping to guide Cuban refugees safely to U.S. shores. (*Id*. at 00:08:20-00:11:45, 00:23:40-00:25:10.) Later, we learn Rene has also been recruited to work with PUND,[6] another anti-Castro exile group. (*Id*. at 00:30:32.) While flying with PUND, Rene is unwittingly roped into a drug smuggling mission. (*Id*. at 00:31:15.) He later tells Roque about this at Ana's house. (*Id*. at 00:32:58.) The two men converse in Russian, presumably to prevent Ana from being able to understand them. Rene is distraught because he wants nothing to do with drug smuggling. Roque says, "I told you," indicating that he, too, does not condone drug smuggling, and offers to put Rene in touch with the FBI. (*Id*. at 00:33:46.) In the following scene, Rene meets with Roque's cousin, who is an FBI informant, along with an FBI agent. Rene tells the FBI agent, "I won't take part in [PUND's] criminal activities." (*Id*. at 00:34:25.) The FBI agent offers Rene $1,500 per week to inform on PUND and says, "Your friend Juan Pablo Roque has been working with us for a year." (*Id*. at 00:34:50.) Rene responds, "Now I get it. . . His lifestyle." (*Id*. at 00:34:55.)

In a subsequent scene, Roque comes home to find Ana happily working on wedding plans. Ana, who has no idea that Roque is working as a well-paid FBI informant, questions him about the source of the money for his expensive cell phone and Rolex watch. (*Id*. at 00:37:20-00:41:00.) He initially says it is from a book deal he has made, but she demands to know whether he is involved in drugs. He tells her in no uncertain terms that he is "not involved in drugs," but that "you don't know everything about me and it's better for you that way." (*Id*. at 00:40:48-00:40:58.) He is clearly referring to the fact that he is working as a double agent with the FBI – the latter being the mysterious source of his funds.

There is a big turnout of the exile community at Ana and Roque's wedding. The church service is followed by a garden party, and then an after-party at a night club. In the early hours of the morning, Roque carries Ana to their hotel room, kissing her. (*Id*. at 00:44:05-00:50:20.)

Some months later, Roque tells Ana that he has to leave early the next morning, at 3

---

[5] Rene and his wife Olga feature much more prominently in the Film than Ana and Roque.
[6] The "National Democratic Unity Party" is known by the Spanish acronym "PUND." *See* "Exile group says it's responsible for raid," Tampa Bay Times (Oct. 18, 1994), *available at* https://www.tampabay.com/archive/1994/10/18/exile-group-says-it-s-responsible-for-raid/.

a.m., for a weekend trip.  (*Id*. at 01:08:00; FAC ¶ 92.)  At the end of a tense evening, the married couple begins to make love.  (Film at 01:09:00.)  The next morning Roque flies to Havana.  Ana tries to call him from her office but gets no answer on his cell phone. She rushes home to find his drawers empty, his things gone, and his cell phone intentionally left in his Jeep.  (*Id*. at 01:10:00-01:11:06.)

The following day Brothers planes drop flyers over Havana in support of anti-Castro protests.  Tragically, Cuban MiGs shoot down two of the three planes.  (*Id*. at 01:12:40-01:16:50; FAC ¶¶ 63-77.)  Ana, frantic with worry about Roque, learns of the shootdown (Film at 01:16:50-01:17:45; *see* FAC ¶ 84.)  She wakes up the next day to find reporters swarming her home and turns on the television to see Roque, back in Havana, giving an interview.  (Film at 01:18:15-01:20:00; *see* FAC ¶ 93.)  Asked what he misses most of his life in Miami, he replies "my Jeep Cherokee."  (Film at 01:19:50; FAC ¶ 98.)  Ana is stunned and hurt, visibly in tears as she processes Roque's betrayal.  (Film at 01:19:30-01:19:55.)

At the conclusion of the film, text cards provide additional information about what happened in real life following the events portrayed in the Film.  One card says, "Ana Margarita Martinez sued the Cuban government.  She was awarded $27 million in punitive damages.  To this day, she has collected only $200,000."  Another states that Roque was never a pilot again and, facing money problems, sold his Rolex on eBay.  (*Id*. at 02:02:00-02:02:20.)

## THE FIRST AMENDED COMPLAINT

The 46-page FAC is virtually unchanged from the original Complaint.[7]  The only substantive addition is in Paragraph 114, in which Plaintiff points to eight specific scenes in the Film that she claims defame her.[8]  Because the Court has already ruled that the allegations

---

[7] The 56 paragraphs devoted to a "historical background" of "The Cuban Revolution and The Cuban Freedom Fighters," "Brothers to the Rescue," the 1996 shootdown of the Brothers planes and the trial of the Cuban Five remain.  Indeed, of the 148-paragraph FAC, only a fraction concerns Plaintiff and her alleged defamation in the Film.  She dedicates much of the FAC to objecting to the portrayal of the Cuban exile community generally, or to the portrayals of other characters and entities.  As detailed in Defendants' motion to dismiss the Complaint, these complaints – even if they were accurate, which they are not – are not actionable by Plaintiff.  (*See* D.E. 18 at 17.)  Plaintiff even complains about pro-Castro Cuban *characters* in the Film calling anti-Castro dissidents "gusanos," or traitors. (FAC ¶ 10).

[8] Plaintiff refers to these scenes as "examples," but as the Court made clear in its Order, under Florida law, a party must "identify and describe allegedly defamatory statements in a

in the original Complaint fail to state a claim, this Motion focuses on the new allegations. These remain inadequate to state a legally cognizable claim for defamation or IIED.

Plaintiff again alleges that the Film portrays her not as the hard-working mother that she was – it does not portray her as a mother at all – but rather "as a sexually promiscuous immoral woman, who is involved with drug trafficking and terrorist activities." (*Id.* at ¶¶ 113-114.) Paragraph 114 includes subparts (a)-(l) identifying eight allegedly "false and slanderous scenes" in the Film.[9]  As is evident from the Court's review of the Film, each of Plaintiff's new descriptions misquotes the Film, contradicts her own allegations and/or blatantly mischaracterizes the scenes:

| | Scene | Plaintiff's Description | The Film |
|---|---|---|---|
| a) | (00:21:40.) Ana and Roque Meet | "The Film falsely portrays Ms. Martinez as being highly flirtatious with Roque when they first met at a small church (contrary to the film, she did not tell him he looked like a sexy movie star)."[10] | Ana asks Roque, "Did anyone tell you you look like a movie star?" (00:21:40.)  The FAC falsely adds the word "sexy" to Ana's dialogue.  There is nothing defamatory in the scene. |
| b) | (00:22:20-00:23:30.) Ana and Roque's First Date | "The immediately following scene Roque and Ms. Martinez pulling up [sic] in front of Ms. Martinez's home and then engage in a sexualized encounter supposedly with Ms. Martinez's ex-husband nearby in Ms. Martinez's home. . . In reality, Ms. Martinez did not go on a date with Roque until a long time after they first met at the small church; Roque did not have a car; they did not kiss; and Ms. Martinez's ex-husband was not still living in her home when | Plaintiff complains the timing of the first date is inaccurate, but (i) the Film does not indicate how much time has passed since Ana and Roque met, and (ii) Plaintiff herself pleads that she and Roque "met formally at a church group event during May 1992 and *began dating shortly thereafter*." (FAC ¶ 59 (emphasis added).)  Thus, Plaintiff's own pleading contradicts this alleged falsehood.<br><br>The description of the encounter as "sexualized" is hyperbolic at |

larger work."  (Order at 11.)  Therefore, the identified scenes are the only ones on which Plaintiff may base her claims.

Plaintiff also made small tweaks to four paragraphs. (*See* FAC ¶¶ 5 (adding "based on a true story"), 107 (changing "based on a true events" to "based on a true story"), 109 (swapping "unmistakable" for "mistakable"), and 113 (adding the phrase "*See infra*")).

[9] Subparagraphs (n)-(p) of Paragraph 114 are omitted as they were in the original Complaint and do not identify any specific scenes in the Film, as required to state a defamation claim.

[10] Plaintiff included scene numbers, purportedly from the Film's script.  The Motion to Dismiss does not refer to the scene numbers, as the script is not an exhibit to the FAC.

| | | she dated Roque or at any point in time after her divorce." | best, as it merely shows a good night kiss, after which Ana pulls away and concludes the evening.<br><br>As discussed below, the remaining alleged falsehoods do not constitute defamation as a matter of law. |
|---|---|---|---|
| c)[11] | (00:25:13-00:32:17.) Rene's Involvement with PUND | "The following scenes of the Film show Roque and Rene's purported involvement in purported 'terrorist' activity and drug trafficking as members of Brothers to the Rescue." | This allegation concerns the portrayal of Rene and Roque, not Plaintiff.  The Court found that Ana was depicted in only a "handful of scenes" and that Plaintiff failed to "explain what scenes defame her any why." (Order at 12.) Plaintiff *still* fails to do this here.<br><br>Plaintiff also fundamentally mischaracterizes these scenes.  In fact, the Film makes clear that it is another anti-Castro organization, PUND, and not Brothers to the Rescue, that engaged in drug smuggling. (00:30:32 ("I heard Rene left Basulto and joined PUND.  With them, you never know where the fight for a free Cuba ends and drug smuggling begins."), 00:31:05 (pilot directing Rene in the drug smuggling scene says, "Did you follow the flight plan when you were working for the Hermanos?", making clear that this is not Brothers to the Rescue).)<br><br>A subsequent conversation between Rene and Roque – in which Rene tells Roque about PUND's activities and Roque suggests he contact the FBI – |

---

[11] Subparagraph (c) contains three discrete subparts, which the FAC identifies separately above.

| | | | |
|---|---|---|---|
| | | | confirms this and underscores that neither is involved in drugs. (00:32:18-00:34:00.) |
| (c) | (00:32:18-00:34:00.) Roque and Rene Discuss PUND's Drug Smuggling | "The Film cuts to a scene of Ms. Martinez at her home. . . This home is much more luxurious than the modest home that Ms. Martinez actually lived in with her two young children. . . . This is one of the first of many scenes to follow that are fabricated to fit the Film's false narrative that Ms. Martinez was enjoying a lush and comfortable lifestyle derived from ties to illegal activity being conducted by Roque and the so-called Cuban mafia." | As noted above, the Film directly contradicts that Roque is involved with drugs.  Therefore, it necessarily does not portray Ana as enjoying a "lush and comfortable lifestyle" funded by illegal activity.  Moreover, even assuming *arguendo* that the home depicted in the Film is less "modest" than Plaintiff's was, (i) that is not defamatory, and (ii) the alleged falsity is too subjective to be proven objectively false, as is necessary to be actionable. |
| (c) & (m) | | "Ms. Martinez's two young children do not appear at all in the Film, which gives the false impression that she was an absentee or delinquent mother." | This claim is patently absurd.  The Film *never* portrays Ana as having children at all, as the Court's Order correctly notes.  Therefore, it does not portray her as an absentee or delinquent mother. |
| (d) & (e) | (00:37:20-00:38:00.) Ana Wedding Planning | "The Film falsely shows Ms. Martinez as being very excited to have Jorge Mas Canosa, the supposed 'godfather' of the 'Cuban Mafia' attend her upcoming wedding. . . . This portion of the Film . . . falsely portrays Ms. Martinez as being actively and excitedly involved with the mafia." | Ana tells Roque that Jorge Mas Canosa will attend their wedding, but the words "godfather" of the "Cuban mafia" appear nowhere; rather, they are fabricated by Plaintiff in an attempt to manufacture a defamation claim.<br><br>This scene also makes clear that far from being "actively…involved" with Mas Canosa, in fact neither Ana nor Roque knows him.  Roque says, "I've never met him." |
| (f)[12] | (00:38:04-00:41:00.) Ana Confronts Roque | "When Ms. Martinez's character in the Film believes her fiancé (Roque) is involved in drug trafficking, her character is shown to do nothing other than | When Ana confronts Roque about whether he is involved in drugs, he unequivocally denies it. (00:40:45 ("I'm not involved in drugs.").)  Therefore, she is not |

---

[12] Subparagraph (f) also contains two subparts, which are treated separately above.

| | | | |
|---|---|---|---|
| | | to lightly complain – and Ms. Martinez therefore falsely depicted [sic] as being a willing [sic] to accept, to enjoy, and to help conceal, that the falsely depicted lavish lifestyle was a result of felony drug trafficking by Roque." | depicted as accepting, enjoying, or concealing a lavish lifestyle resulting from drug trafficking – which Roque makes clear he is not engaged in.  And the Film makes clear that what makes Ana question him – his cell phone and Rolex – were the product of his FBI compensation. |
| (f) | (00:38:04-00:41:00.) Ana Confronts Roque | "Ms. Martinez is portrayed as believing that Roque is a hardened criminal, but still willing to continue with the marriage.  In reality, at no point in time did Ms. Martinez ever suspect that Roque was ever involved in any criminal activities.  The Film is therefore highly defamatory as to Ms. Martinez's character as a woman and mother of two young children." | As noted above, Ana has no children in the Film.  Therefore, Plaintiff's complaints about the Film defaming her as a bad mother are entirely baseless. As to portraying Ana as having suspicions about how Roque can afford a Rolex or a cell phone, as discussed below, such a portrayal does not rise to the level of defamation, as a matter of law.  And Roque makes clear that he is *not* involved with drugs. |
| (g) | (00:34:00-00:40:00.) Rene Works with the FBI to Take Down PUND; Ana Confronts Roque | Plaintiff alleges that the series of scenes depicting Rene meeting with an FBI agent and participating in a sting resulting in the arrest of PUND operative, followed by the scene in which Ana confronts Roque underscores "Ms. Martinez false acceptance of Roque being involved in drug trafficking" and her "having connections with the 'Cuban mafia'." | The scenes depicting what *Rene* does are not depictions of Ana doing anything. Moreover, these scenes underscore that *Roque* is *not* involved in drug trafficking and was telling Ana the truth when he denied it.  Plaintiff deliberately mischaracterizes the actual content of the Film. |
| (h), (i) & (j) | (00:44:00-00:48:35.) Ana and Roque's Wedding & Reception | Plaintiff alleges that these scenes falsely portray her as "willingly" marrying a "criminal drug trafficker."  Likewise, she claims that Ana's wedding reception was "extravagant" and "Godfather style," unlike her wedding to Roque, and that this "present[s] a defamatory image of Ms. Martinez living a mafioso-like lifestyle paid for by | Again, the Film never depicts Roque as being involved in drugs, and he has expressly (and truthfully) assured Ana that he is not.  The allegation that she is portrayed willingly marrying a drug trafficker is baseless. Further, portraying Ana as having a beautiful wedding is not defamatory as a matter of law. |

| | | cocaine and terrorist activities." | |
|---|---|---|---|
| (k) & (l) | (00:48:40-00:50:22.) Afterparty at Club Alcazaba | Plaintiff admits that "[t]here actually was a wedding after-party at Club Alcazaba," but alleges that it portrays her as "over-sexualized and reckless" because Ana dances with a man other than Roque and because Roque carries her to their hotel room afterwards – which Plaintiff assumes means he "ha[d] to carry her" and she must have been "drunk." | Ana is portrayed at the after-party as mingling and dancing with various friends, and dances for a few seconds with a male guest before moving on and going to Roque.  Plaintiff's characterization of this conduct as "over-sexualized" or "reckless" is absurd.  The Film then portrays Roque carrying Ana into their hotel room – presumably because, as a newly married couple, he romantically carried her over the threshold.  Plaintiff's assumption that he must carry her because she is too drunk to walk is bizarre and again mischaracterizes the Film. |

Beyond their factual inaccuracies and mischaracterizations, Plaintiff's allegations rely on subjective interpretations – such as describing Ana as being "highly flirtatious" (¶ 114(a)) or as having a "more luxurious" home than Plaintiff's "modest" one  (¶ 114(c)).  As detailed below, subjective statements like these, which cannot readily and objectively be proven false, cannot sustain a defamation claim; to hold otherwise would violate the First Amendment principles that demand a narrow standard for claims based upon speech.   Plaintiff also complains about minor alleged inaccuracies that do not defame her, such as the fact that Roque did not in fact have a car, as she alleges his character did in the Film (¶ 114(b)).[13]

Based on the foregoing allegations, Plaintiff asserts four defamation claims – two for defamation *per se* and two *per quod*, each alternatively alleging negligence and "knowing or reckless disregard." (*Id.* at ¶¶ 136, 144, 151, 159.)  Plaintiff offers only conclusory damage allegations.   (FAC ¶¶ 138, 146, 153, 161 ("*The Wasp Network* [sic] therefore harms the reputation of Ms. Martinez, as to lower her in the estimation of the community, or to deter third persons from associating or dealing with Ms. Martinez"), 140, 147 ("Defendants' conduct caused Ms. Martinez actual damages"), 155, 163 ("Defendants' conduct caused Ms.

---

[13] Moreover, the Film portrays Roque *driving* a car; it does not indicate that he *owns* it.

Martinez actual damages and/or special damages").)  Plaintiff also alleges a "conspiracy to defame" against defendants Netflix, Orange and the film's writer and director, Olivier Assayas.[14]  (*Id.* at ¶¶ 165-71.)   Finally, Plaintiff asserts a claim for intentional infliction of emotional distress, alleging "the Film portrays Roque and the other Cuban spies in a falsely favorable light."  (*Id.* at ¶¶ 172-79.)  These claims fail, for the reasons set forth below.

## ARGUMENT[15]

"[W]here the facts are not in dispute in defamation cases, pretrial dispositions are 'especially appropriate' because of the chilling effect these cases have on freedom of speech." *Marder v. TEGNA Inc.*, No. 19-81283-CIV, 2020 WL 3496447, at *3 (S.D. Fla. June 29, 2020) (granting 12(b)(6) motion dismissing defamation claim) (quoting *Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 363 (Fla. 4th DCA 1997)).  "Thus, courts routinely dismiss defamation claims at the motion to dismiss stage."  *Id.*

First Amendment protections unquestionably apply to motion pictures and other works of entertainment. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) ("The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform."); *see also Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65 (1981).  Thus, this case presents exactly the sort of "groundless litigation" which should not be permitted to chill protected speech.  *Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1320 (S.D. Fla. 2020) ("[T]he Eleventh Circuit acknowledges a 'powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation.'") (quoting *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016)).

To survive a motion to dismiss, a pleading must state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Factual allegations are presumed true, but courts do not "accept as true

---

[14] As Plaintiff now knows from discovery, Netflix merely licensed distribution rights after the Film was completed, and Orange helped finance its production in exchange for distribution rights; neither had any role in the Film's creation.  Therefore, Plaintiff's restating in the FAC the claim that Netflix and Orange "conspired" to defame Plaintiff based on the content of the Film is both frivolous and in bad faith.

[15] Citations and quotations are omitted, and emphases are added, unless otherwise indicated.

'unwarranted deductions of fact' or legal conclusions." *Henry v. Jon*es, 484 F. App'x 290, 291 (11th Cir. 2012).

## I.  Legal Standard for Defamation Claims

To state a claim for defamation under Florida law, a plaintiff must allege: (1) publication; (2) falsity; (3) that the publisher acted with knowledge or reckless disregard as to the falsity on a matter concerning a public figure, or at least negligently on a matter concerning a private person; (4) actual damages; (5) that the statement is defamatory. *Parekh v. CBS Corp.*, 820 F. App'x 827, 833 (11th Cir. 2020) (citing *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1105 (Fla. 2008)). Where a plaintiff does not allege a literal factual falsehood, but rather defamation "by implication," she must show "(1) a juxtaposition of a series of facts so as to imply a defamatory connection between them, or (2) the creation of a defamatory implication by omitting facts." *Klayman v. City Pages*, 650 F. App'x 744, 749 (11th Cir. 2016).

It is well-settled that "our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of 'breathing space' so that protected speech is not discouraged." *Jews For Jesus, Inc.*, 997 So. 2d at 1110. Indeed, "[w]hatever is added to the field of libel is taken from the field of free debate." *Id*. For that reason, defamatory statements are narrowly defined and subject to a high bar. To be defamatory, a statement must "'expose[]a plaintiff to hatred, ridicule, or contempt or injure[] his business or reputation or occupation.'" *Parekh*, 820 F. App'x at 833 (quoting *Jews for Jesus*, 997 So. 2d at 1108-09). Moreover, "[t]rue statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714–15, 717 (11th Cir. 1985). "Whether a statement is susceptible to defamatory interpretation is a question of law left to the Court." *Bongino*, 477 F. Supp. 3d at 1317; *see Turner*, 879 F.3d at 1269.

Where a defamation claim is based on a film, the court reviews the entire film to place the allegedly defamatory statement in its proper context, as the Court did in adjudicating the motion to dismiss the Complaint.[16] *See Spilfogel v. Fox Broad. Co.*, No. 09-CV-80813, 2010 WL 11504189, at *4 (S.D. Fla. May 4, 2010), *aff'd,* 433 F. App'x 724 (11th Cir. 2011); *Parekh*,

---

[16] Plaintiff's allegations repeatedly attempt to take fragments of scenes or dialogue *out* of the context of the entire Film.

2020 WL 3400679, at *3.

      As noted above, Defendants bring claims for defamation *per se* and defamation *per quod*. Historically, plaintiffs suing for defamation *per se*, *i.e.*, statements that are allegedly defamatory on their face, were not required to plead or prove actual injury.  But following the Supreme Court's decision in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), "a plaintiff suing a media defendant must nevertheless plead and prove actual injury." *Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 798 (Fla. DCA 4th Dist. 2001) (dismissing complaint for failure to allege actual injury) (citing *Mid-Fla. Television Corp. v. Boyles*, 467 So. 2d 282 (Fla. 1985)); *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021).  Further, to state a claim for defamation *per quod*, a plaintiff must allege special damages, *i.e.*, actual economic injury. *Anderson v. Smith*, No. 3:19-cv-222-J-JRK, 2020 WL 10058207, at *3 (M.D. Fla. Mar. 24, 2020) Here, Plaintiff has done neither, mandating dismissal of all of her defamation claims.

## II.    The Film Contains No Defamatory Depictions of Plaintiff

### A.    Viewers Understand the Film Is Dramatized, Not a Documentary

      As a threshold matter, the Film is not a documentary, but a *docudrama*, a common and well-known form of entertainment that viewers recognize as presenting dramatizations that may vary from historical fact even though they are based on true stories.  *See Davis v. Costa-Gavras*, 654 F. Supp. 653, 657-58 (S.D.N.Y. 1987) ("Docudramas utilize simulated dialogue, composite characters, and a telescoping of events occurring over a period into a composite scene or scenes.").  Courts have noted that "[v]iewers are generally familiar with dramatized, fact-based movies and miniseries in which scenes, conversations, and even characters are fictionalized and imagined." *De Havilland v. FX Networks, LLC,* 21 Cal. App. 5th 845, 866 (Cal. Ct. App. 2018) (striking actress De Havilland's complaint alleging, *inter alia*, that a fictionalized docudrama miniseries falsely portrayed her), *cert. denied*, 139 S. Ct. 800 (2019). Courts thus recognize that modern day audiences of docudramas understand that they are watching dramatizations, not exacting recreations of events.  Viewers of such dramatized fact-based films "would be sufficiently familiar with this genre to avoid assuming that all statements [therein] represent assertions of verifiable facts. To the contrary, most [viewers] are aware by now that parts of such programs are more fiction than fact." *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995).  Differences between the portrayal of Ana and Plaintiff's actual life – such as the fact that Ana does not have children, or that Roque drove a car on

their first date – cannot be the basis of a defamation claim, as the audience would understand that as a docudrama the Film necessarily includes dramatized portrayals.  If Plaintiff's standard were applicable, there could be no docudrama at all – it would be impossible for the filmmakers to know and depict the content of every private event and conversation as opposed to a literal reporting of historical facts.

### B.    The Scenes Plaintiff Identifies in the FAC Are Not Defamatory

Plaintiff's allegations based on the eight scenes identified in Paragraph 114 boil down to three allegedly defamatory portrayals:

- (1) Plaintiff as a "flirtatious" "party-girl."  (FAC ¶ 114(a), (b), (k), (l))
- (2) Plaintiff knowingly and willingly living a "luxurious" life funded by Roque's "drug trafficking" and "terrorism."  (FAC ¶ 114(c)-(j))
- (3) Plaintiff as a bad mother. (FAC ¶ (c), (m))

These claims fail because they are contradicted by the Film's content, they are not facts capable of being proven false, or they quite simply do not rise to the level of defamation.

### 1.    The Alleged Portrayal of Ana as a "Party-Girl" Cannot Sustain a Defamation Claim

This allegation is based on three scenes identified in the FAC: Ana and Roque Meet (00:21:40) (FAC ¶ 114(a)); Ana and Roque's First Date (00:22:20-00:23:30) (FAC ¶ 114(b); and the Afterparty at Club Alcazaba (00:48:40-00:50:22) (FAC ¶ 114(k)-(l)).  The FAC significantly mischaracterizes all three scenes.  Nothing therein substantiates that Plaintiff is portrayed as a "flirtatious" "party-girl" (which would not be defamatory as a matter of law in any event), let alone a "sexually promiscuous immoral woman."  (FAC ¶¶ 113-114.)

The scene where Ana and Roque meet substantially conforms to Plaintiff's own pleaded allegations: they met at church.  (FAC ¶ 59.)  Plaintiff complains that the Ana character is too flirtatious, telling Roque he looks like a "sexy movie star."  (*Id.* ¶ 114(a).)  But, whether by accident or design, Plaintiff misquotes the line, adding the word "sexy," which Ana does not say.  The scene depicts nothing inappropriate.

As for the scene concluding Ana's first date with Roque, he makes advances, but she rebuffs them.  Plaintiff complains about four aspects of this scene.  First, she says she did not go on a date with Roque until a "long time" after they met.  However, this is contradicted by her own allegation that the two met at church in 1992 "and began dating shortly thereafter."

(FAC ¶ 59.)[17]  Second, Plaintiff complains that Roque did not own a car.  Putting aside that the Film merely portrays Roque *driving* a car, this in no way defames Plaintiff and is the quintessential sort of artistic license taken in a docudrama.  *See Jews for Jesus*, 997 So. 2d at 1101.  If this kind of minor factual inaccuracy were actionable as defamation, the litigation floodgates would be opened.  Third, Plaintiff complains that she and Roque did not kiss on their first date.  This, too, would not be taken literally by viewers, *De Havilland*, 21 Cal. App. 5th at 866, and even if it were, portraying a first date kiss is not defamatory.  *See Budd v. J.Y. Gooch Co.*, 157 Fla. 716, 720 (1946) (describing a woman as a "common law wife" or "having lived with a man in a relation of concubinage" was not inherently defamatory).  Fourth, Plaintiff claims her ex-husband was not staying with her while his apartment was being renovated.  But the Film makes clear that they had no romantic relationship, as Roque asks, "Is it over between you?" and Ana unequivocally replies, "Yes!"  (Film at 00:22:55.)  This, too, as a matter of law is incapable of defaming Plaintiff.

As for the scene at the afterparty, Ana is depicted mingling and dancing with her wedding guests, including dancing for a few seconds with a male guest.  They engage in no sexual conduct, and she quickly moves on and goes to Roque.  As a matter of law, this is not defamatory.  *See Rubinson v. Rubinson*, 474 F. Supp. 3d 1270, 1276 (S.D. Fla. 2020) (where the statement alleged to be defamatory "could not 'possibly have a defamatory or harmful effect, the court is justified … in dismissing the complaint for failure to state a cause of action.'") (quoting *Wolfson v. Kirk*, 273 So. 2d 774, 778 (Fla. DCA 4th Dist. 1973)).  Plaintiff then alleges that the Film portrays Ana as drunk because Roque carries her in their hotel room the morning after.  In fact, Ana appears at most "perhaps slightly inebriated," as the Court describes in its Order (at 8), and the more plausible interpretation of the hotel scene is that Roque carried his new bride over the threshold.  In any event, this scene is not defamatory as a matter of law.  *Mennella v. American Airlines, Inc.*, 824 Fed. App'x 696, 702 (11th Cir. 2020) (calling person "drunk" not defamatory).

### 2.     The Film Does Not Imply Plaintiff Was Involved in Drug Trafficking or Any Criminal Enterprise

As the Court has already found, Plaintiff's allegation that she is portrayed as "involved

---

[17] The Film does not indicate how much time has passed between the characters' first meeting and first date.

with drug trafficking and terrorist activities," and as enjoying a lifestyle financed thereby (FAC ¶ 114(c), (f)-(j)), is unsupported by the Film.  (Order at 12 n.4.)  Indeed, this allegation deliberately misrepresents the Film's depictions of Ana and Roque.   To support this allegation, Plaintiff points to six scenes: Rene's Involvement with PUND (00:25:13-00:32:17) (FAC ¶ 114(c)); Roque and Rene Discuss PUND's Drug Smuggling (00:32:18-00:34:00) (FAC ¶ 114(c)); Rene Works with the FBI to Take Down PUND (00:34:00-37:20) (FAC ¶ 114(g)); Ana Wedding Planning (00:37:20-00:38:00) (FAC ¶ 114(d)-(e)); Ana Confronts Roque (00:38:04-00:41:00) (FAC ¶ 114(f), (g)); and Ana and Roque's Wedding & Reception (00:44:00-00:48:35) (FAC ¶ 114(h)-(j)).

Three of these scenes do not depict or refer to Ana at all.  They depict *Rene* as being involved with PUND's drug smuggling, and Roque recommending Rene report this to the FBI.  (Film at 00:30:32, 00:31:15, 00:33:45-37:20.)  Plaintiff pleads no relationship with Rene; there is no basis to conclude that a portrayal of Rene reflects on her whatsoever.  As a matter of law, these scenes – which concern *another character* – cannot support Plaintiff's defamation claim.  *Parekh*, 820 F. App'x at 833-34 (defamatory statement must be "of and concerning" plaintiff).

As for the remaining scenes, the Film does not support Plaintiff's allegation that either Roque or Ana is portrayed as involved in drug-trafficking or terrorism.   Roque is *never* depicted as having any role in drug trafficking or terrorist activities.   The Film shows that Roque afforded his lifestyle – including his Rolex, Jeep and fine clothing – because he was a well-paid FBI informant, not a drug dealer or terrorist.  (Film at 00:34:16-00:35:00, 00:38:00-00:41:02.)  *See Murray v. Pronto Installations, Inc.*, No. 8:20-CR-824-T-24AEP, 2020 WL 6728812, at *3 (M.D. Fla. Nov. 16, 2020) ("statement should not be interpreted in the extreme, but as the 'common mind' would normally understand it").

Contrary to the characterization in the FAC, the Film does not depict Ana as being "willing to accept, to enjoy, and to help conceal . . . felony drug trafficking by Roque."  (FAC ¶ 114(f)).  Rather, Ana questions Roque about her suspicions, and the argument ends only when Roque explicitly – and truthfully – assures her he is not involved in drug trafficking.  Likewise, the allegation that Plaintiff "is portrayed as believing that Roque is a hardened criminal, but still willing to continue with the marriage" (*id.*) is patently false.  Indeed, the

marriage takes place only *after* Roque has assured Ana that he is not involved with drugs.[18]

The allegation that Plaintiff is portrayed as mixed up with the "Cuban mafia" (a phrase fabricated by Plaintiff (and which is not quoted in the Film despite the FAC's misleading quotation marks) because Ana is "excited" for Jorge Mas Canosa to attend her wedding (FAC ¶ 114(d)-(e)) likewise fails to state a defamation claim as a matter of law. As Plaintiff herself pleads, Mas Canosa is a "leader[] of the Cuban-American exile community" (FAC ¶ 114(j)); Ana's excitement that an acknowledged leader of her community would attend her wedding is entirely understandable. Moreover, the Film makes clear that neither Roque nor Ana had ever met Canosa prior to the wedding, let alone was Ana "actively . . . involved" with the mafia.

Finally, Plaintiff's allegation that the Film portrays an "extravagant 'Godfather style' wedding" that is "paid for by drug money and terrorist activities," (FAC ¶ 114(j)), also bears no relation to what actually unfolds onscreen. The Film depicts a beautiful wedding and garden party attended by appropriately attired guests, as well as press presence (none of which is defamatory), but in no way, express or implied, indicates the wedding was financed with money from narcotics trafficking. Moreover, the allegations describing the wedding as "extravagant" and Godfather style" epitomize subjective descriptions which cannot be proven true or false, and which therefore cannot be actionable. *Turner*, 879 F.3d at 1264.

### 3. The Film Does Not Depict Plaintiff as "an Irresponsible Mother"

As the Court has also held, Plaintiff's allegation that the Film depicts her as an "irresponsible mother who knowingly endanger[ed] her young children" is unsupported by the Film, which never portrays Ana as having children. (Order at 12 n.4.) Plaintiff nevertheless repleads this same allegation (FAC ¶ 114(m)), attempting to salvage it by arguing that people who know Plaintiff as a mother would nevertheless view her this way. This is utter nonsense. As discussed above, viewers are conditioned to the idea that docudramas may be based on true events, but are necessarily dramatized. Thus, the audience – even those who know Plaintiff – would understand that the Film portrays Ana as not having children, and therefore necessarily not as an "irresponsible," "absentee," or "delinquent" mother.

---

[18] Depicting Ana as having suspicions, about which she confronts Roque and which he truthfully denies, cannot be defamatory as a matter of law because it could not subject Plaintiff to hatred, ridicule, contempt, or disgrace.

(FAC ¶¶ 114(c), (m).)  Plaintiff cannot base her defamation claim on aspects of the Film that do not exist.

### C.   Plaintiff's Defamation Claims Fail Because the FAC Offers Only Conclusory Allegations of Damages

With regard to defamation *per se*, following *Gertz*, it is well-settled that "a plaintiff suing a media defendant must nevertheless plead and prove actual injury."  *Edelstein*, 798 So. 2d at 798; *Corsi*, 519 F. Supp. 3d at 1119.  Here, both Netflix, as the distributor of the Film, and Orange, as a producer, are considered media defendants.  *See Street v. Nat'l Broad. Co.*, 512 F. Supp. 398, 406 n.6 (E.D. Tenn. 1977), *aff'd*, 645 F.2d 1227 (6th Cir. 1981) (applying *Gertz*'s actual damages requirement to acquirer and distributor of television docudrama about the Scottsboro trial and noting that "[t]elevision entertainment, as well as news reports, is under the blanket of First Amendment protection").  Further, damages must be pled consistently with *Iqbal*/*Twombly* plausibility standards.  *See Collins v. BSI Fin. Servs.*, No. 2:16-CV-262-WHA, 2017 WL 1045062, at *3 (M.D. Ala. Mar. 17, 2017); *Geller v. Von Hagens*, No. 8:10-1688-EAK, 2010 WL 4867540, at *4 (M.D. Fla. Nov. 23, 2010).  But here, Plaintiff has pleaded only conclusory allegations that do no more than recite the elements of the cause of action.  (FAC ¶¶ 137-38, 140, 145-47.)  These conclusory allegations fail to provide any *facts* about the actual injury suffered by Plaintiff; as a matter of law, these allegations are insufficient to plead actual injury.  *See Collins*, 2017 WL 1045062, at *3 (citing *Ashcroft*, 556 U.S. at 678-79); *Geller*, 2010 WL 4867540, at *4.

Further, to state a claim for defamation *per quod*, a plaintiff must allege special damages, *i.e.*, actual economic injury.  *Anderson*, 2020 WL 10058207, at *3 (dismissing defamation *per quod* claim where plaintiff pled only conclusory damages).  Plaintiff has pled the most bare-bones of allegations: "Defendants' conduct caused Ms. Martinez actual damages and/or special damages."  (FAC ¶¶ 155, 163.)  She provides no facts supporting any claim of "realized or liquidated loss."  *Anderson*, 2020 WL 10058207, at *3.  Therefore, Plaintiff's claims for defamation *per quod* should be dismissed as a matter of law.

## III.   The Casting of Particular Actors Does Not Support A Cognizable Defamation Claim

Plaintiff also re-asserts her strained allegations that the use of particular actors in the Film who had previously appeared nude (*i.e.,* Ana de Armas as Ana) or portrayed criminals (*i.e.,* Wagner Moura as Roque) in separate, unrelated films or tv shows constitutes a

defamatory statement as to Plaintiff. (FAC ¶¶ 113, 114(n)). This frivolous proposition should be firmly rejected for the reasons stated in the motion to dismiss the Complaint. (D.E. 18 at 16.)

## IV.   Plaintiff's "Conspiracy to Defame" Claim Also Fails

Because the Complaint fails to state a legally sufficient claim for defamation, Plaintiff's fifth count for "Conspiracy to Defame" should also be dismissed. *See Thomas v. Patton*, No. 162005CA003777XXXXMA, 2005 WL 3048033, at *4 (Fla. Cir. Ct. Oct. 21, 2005), *aff'd and remanded,* 939 So. 2d 139 (Fla. DCA 1st Dist. 2006) ("Without a defamation, there can be no conspiracy to defame."); *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, No. 6:08-CV-466-ORL-28GJK, 2010 WL 1408391, at *24 (M.D. Fla. Apr. 6, 2010), *aff'd,* 451 F. App'x 862 (11th Cir. 2012) ("The underlying tort on which this count is based is defamation, and, as concluded earlier in this Order, no actionable defamation claim has been stated.").

## V.   Plaintiff Has Not Alleged Conduct "Beyond All Possible Bounds of Decency" Necessary to Support an Intentional Infliction of Emotional Distress Claim

Plaintiff has ignored the Court's admonishment that her IIED claim "is unlikely to succeed" because the Film does not support the requisite threshold of outrageous conduct. (Order at 13 n.5.) Plaintiff has simply repleaded her original IIED claim, which should now be dismissed with prejudice.[19]

To state an IIED claim, a plaintiff must allege conduct "'so outrageous in character, and so extreme in degree, that it is considered atrocious and utterly intolerable in a civilized community.'" *Piccolo v. Piccolo*, No. 15-CV-62463, 2016 WL 9526494, at *3 (S.D. Fla. May 6, 2016)). "Whether a claim pleads conduct sufficiently outrageous to support a claim of IIED is a question of law that a court may consider at the motion to dismiss stage and is measured by an objective standard; the subjective response of the person who allegedly suffered emotional distress does not control." *Piccolo*, 2016 WL 9526494, at *3.

As a threshold matter, Plaintiff's claim is barred as duplicative of her defamation claims. "A plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as

---

[19] Because the IIED claim is unchanged, Defendants incorporate by reference as if fully set forth herein their argument as to the insufficiency as a matter of law of Plaintiff's IIED claim. (D.E. 18 at 18-20.)

'outrageous.'"  *Rubinson*, 474 F. Supp. 3d at 1278.  Even if not barred by the so-called single cause of action rule, the conduct Plaintiff alleges – portraying Roque and the other Cuban spies in a "falsely favorable light" notwithstanding Defendants' alleged awareness of Plaintiff's "extreme psychological and emotional distress" caused by Roque's purported sexual assault (FAC ¶¶ 176-77) – does not meet the high threshold of "outrageous" conduct necessary to sustain an IIED claim.  *E.g.*, *Koutsouradis v. Delta Air Lines, Inc.*, 427 F.3d 1339, 1345 (11th Cir. 2005) (noting "obscene and sexually explicit comments, verbal invitations for sex, questions as to a plaintiff's sexual behavior, sexually suggestive gestures and the like do not rise to a level sufficient to support" IIED claim under Florida law); *Foreman v. City of Port St. Lucie,* 294 F. App'x 554, 556–57 (11th Cir. 2008) (plaintiff's allegation that police officer pointed BB gun, which she did not know was empty, at her husband's chest and pulled the trigger did not establish IIED claim under Florida law).

## CONCLUSION

Docudramas like the Film that concern politically-charged matters tend to be approved by some groups and rejected by others.  In *Federation of Turkish-Am. Societies v. American Broad. Cos.*, 620 F. Supp. 56 (S.D.N.Y. 1985), Turkish-American groups asserted civil rights and emotional distress claims concerning the film *Midnight Express*, which offered a harsh portrayal of Turkish culture.  The court noted that "[t]he First Amendment protects the offensive utterance fully as much as it protects the bland or uncontroversial.  In a free society, it cannot be otherwise."  *Id*. at 58.  In dismissing the claims as a matter of law, the court stated that Turkish-Americans "must recall that one of the freedoms which, by their exodus they have obtained for themselves and their children, is that very freedom of speech which … entitles the defendants to summary judgment dismissing this complaint."  *Id*. at 59.  That holding applies with equal vigor here.  The Cuban exile community, including Plaintiff, fled Castro's government to be part of a society that enjoys the freedom of speech that protects controversial artistic expression such as the Film.

For all the reasons set forth above, Netflix respectfully requests that its motion to dismiss the Complaint, with prejudice, be in all respects granted.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Netflix respectfully requests oral argument on its dismissal motion.  Due to the multiple underlying scenes in the Film upon which Plaintiff

premises her claims, and the audio-visual nature of the components at issue, oral argument would be of assistance to the Court.  Netflix anticipates that oral argument will necessitate thirty (30) minutes.

Dated: March 16, 2022

**PRYOR CASHMAN LLP**
*Attorneys for Netflix, Inc.*
Tom J. Ferber (admitted *pro hac vice*)
James G. Sammataro
Felicity S. Kohn (admitted *pro hac vice*)
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone: (786) 582-3010
Facsimile:  (786) 582-3004

*s/ James G. Sammataro*
Florida Bar No. 520292

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 16, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send Notices of Electronic Filing to all counsel of record.

*s/ James G. Sammataro*
James G. Sammataro